IN RE the MARRIAGE OF: Mark William SHARON, Petitioner-Appellant,†

v.

Maureen Anne SHARON, Respondent-Respondent.

Court of Appeals

*No. 92–2587. Submitted on briefs March 10, 1993.—Decided July 28, 1993.*

(Also reported in — N.W.2d —.)

†Petition to review filed.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *James J. Podell* and *Carlton D. Stansbury* of *Law Offices of Podell & Podell* of Milwaukee.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Dwight D. Darrow* of *Darrow & Dietrich, S.C.* of Sheboygan.

Before Nettesheim, P.J., Brown and Snyder, JJ.

SNYDER, J.  Mark William Sharon appeals from a judgment of divorce. He contests the property division award on the basis of the following issues: (1) whether the family court erred by not using two transactions made pursuant to a buy-sell agreement to establish the fair market value of his partnership, and (2) whether the family court's treatment of his accounts receivable as an asset rather than anticipated income was an error in the exercise of discretion. We affirm the family court's property division determinations.

Mark and Maureen Anne Sharon were married in 1979. They have two children, both of whom are minors. Prior to the marriage Mark attended medical school, received his medical degree and started his resi-

dency. At the time of trial, Mark was a physician at the Plymouth Clinic, S.C. and was an equal shareholder in the service corporation. At the time of the marriage, Maureen had a bachelor's degree and during the course of the marriage earned a master's degree in speech pathology. After the birth of their first child in 1984, Maureen worked part-time as a speech and language pathologist for the Plymouth school district.

The business and professional assets of the marriage consist of three interrelated business entities that were established to provide the maximum tax benefits to Mark and the other participating doctors. The Plymouth Clinic, of which Mark is an equal shareholder, is a service corporation that runs the medical facility at which Mark is employed. JWS is a partnership controlled by the Plymouth Clinic shareholders that owns various medical and office equipment which it rents to the facility for its use.[1] The Plymouth Clinic Family Medical Center Associates (Associates) is a partnership that operates a small pharmacy and owns the real estate where the clinic is located. The Plymouth Clinic rents the real estate and computer equipment from Associates. Mark is an equal partner in both of the partnerships. On appeal, the parties dispute the valuation of Associates and the Plymouth Clinic.

The Associates' partnership agreement establishes a buy-sell formula to valuate the partners' interests. The formula provides that in the event that a partner leaves, appraisers are to determine the fair market value of the partnership assets. The agreement

---

[1] The purpose of JWS is to purchase the more expensive pieces of equipment used by the clinic, such as x-ray equipment, a processor, and telephone equipment, which it then rents to the Plymouth Clinic.

does not require a specific valuation methodology. Rather, the formula provides that the terminating partner is entitled to 85% of his proportionate share of the value placed on the assets by the appraisers less his proportionate share of the partnership obligation.

## VALUATION OF BUSINESS ENTITIES

### A. Associates

Within a six-month period, Martin Stepzinski, the certified public accountant for the corporation and partnerships, valued the businesses on three different occasions: (1) in October of 1990 when Dr. Wagner, an equal partner in Associates and a shareholder in the Plymouth Clinic, sold his interest;[2] (2) on December 31, 1990 for purposes of the Sharons' divorce;[3] and (3) in March of 1991 when Dr. Smith bought into the business.[4] Stepzinski utilized the buy-sell agreement to value the businesses on all three occasions.

Todd Mueller, Maureen's expert witness and certified public accountant, agreed on the value Stepzinski placed on the tangible assets, such as the land, building

---

[2] Stepzinski calculated the fair market value for Associates to be $183,881, with a per partner value of $45,970.

[3] By stipulation the parties agreed that the business assets would be calculated as of December 31, 1990. Stepzinski concluded that the fair market value of Associates as of December 31, 1990 was $171,583.84, with a per partner share of $57,194.61. Applying the 15% discount as required under the buy-sell agreement, Mark's share if he were to terminate as of December 31, 1990 was calculated to be $48,615.42. As of December 31, 1990, there were only three partners in Associates, thereby increasing the per partner interest.

[4] Stepzinski calculated that the fair market value of Associates was $166,484, with a per partner share of $41,621.

and inventory. However, Mueller disagreed with Stepzinski's appraisal because no value was given to intangible assets such as the leases owned by Associates. Mueller opined that the lease payments made by the Plymouth Clinic to Associates were above normal. This arrangement in effect masked income that would otherwise be paid to Mark by the Plymouth Clinic. Therefore, Mueller determined that the excess lease payments to Associates should be considered an asset of the partnership. In order to value the leases owned by Associates, Mueller used a method of calculating the present value of future returns from a business' tangible and intangible assets known as the "excess earnings method."[5] Using this methodology, Mueller determined that Mark's interest in Associates was $161,000, not $48,615 as calculated by Stepzinski.

The trial court concluded that the leases had some value and accepted the excess earnings method of valuation used by Mueller with some revisions. The court concluded that the total fair market value of Associates

---

[5] We rely on the following explanation of the excess earnings method, taken from S. PRATT, VALUING SMALL BUSINESSES AND PROFESSIONAL PRACTICES (1986) (hereinafter PRATT), as summarized by Mark:

> The method begins by determining the net value of the tangible assets and determining a "normalized" level of earnings. Then, a "capitalization rate," or rate of return, on the net tangible asset value is determined. The capitalization rate is multiplied by the net tangible asset value to determine the earnings attributable to the tangible asset. That amount is subtracted from the normalized level of earnings. This creates "excess" earnings, or "the amount of earnings above a fair return on the net tangible asset value." The excess earnings are then capitalized at another "capitalization rate." This results in the earnings from intangible assets (i.e., earnings from a lease). The earnings from the intangible net asset is then added to the asset value to achieve the total value of the business. [Citations omitted.]

was $396,773, and Mark's share was $132,000. The court then used this value as an asset for purposes of the property division. The difference between the trial court's valuation of Mark's interest in Associates and Stepzinski's valuation is $83,385.

The division of the marital estate is discretionary and we will sustain it if the trial court examined the relevant facts, applied a proper standard of law, and using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Liddle v. Liddle*, 140 Wis. 2d 132, 136, 410 N.W.2d 196, 198 (Ct. App. 1987). Generally, the valuation of marital assets is a finding of fact that we will not upset unless clearly erroneous. *Id.* However, the underlying facts are not disputed in this case. Rather, the parties dispute the proper methodology to be used to valuate Mark's interest in Associates.

Mark argues that Wisconsin law requires that the buy-sell agreement be considered in the valuation of the business. As this court noted in *Ondrasek v. Ondrasek*, 126 Wis. 2d 469, 475, 377 N.W.2d 190, 192 (Ct. App. 1985):

> Generally, for marital property division purposes, the value of a partner's interest in a professional partnership is determined by the monetary consequences of that partner withdrawing from the business. . . . Often, a buyout agreement between the partners or shareholders will provide the trial court with a method of determining the value of a withdrawing partner's . . . interest in the business. [Citations omitted.]

Mark asserts that the monetary consequences of withdrawing from the partnership are unequivocally demonstrated by the two arm's length sales transac-

tions made pursuant to the buy-sell agreement. Therefore, Mark argues that the issue before this court is a question of law which we should determine independently without deference to the trial court.

We agree that a transaction made pursuant to a buy-sell agreement, such as Dr. Wagner's buy out in this case, may provide the basis for establishing the fair market value of a partnership interest. Contrary to Mark's position, however, such a transaction does not as a matter of law establish the fair market value of the partnership. Rather, it is one available method that the trial court in its discretion may rely on. *Ondrasek* merely stands for the proposition that a buyout agreement *may* provide the trial court with a method of determining the value of a partner's interest, not that such an agreement *per se* determines the value of the withdrawing partner's interest.

Because we conclude that the appropriate valuation methodology is committed to the trial court's discretion, we must next determine if the trial court examined the relevant facts and demonstrated a rational process to reach a reasonable conclusion. Upon reviewing the record, it is clear that the trial court considered the transactions made pursuant to the buy-sell agreement in order to value Mark's interest in Associates. However, after considering all of the facts and expert testimony regarding the nature of the various businesses, the trial court determined that the leases owned by Associates were intangible assets with some value. We cannot say that this was an erroneous or unreasonable conclusion, especially since Mark's

own expert testified that he believed the leases did have some value.[6]

The trial court ultimately accepted the excess earnings method used by Maureen's expert as an appropriate method to value the leases. Mark criticizes at great length the accuracy of the excess earnings methodology and the assumptions used by Mueller.[7] He argues that the trial court misused its discretion in applying the excess earnings method because it was not the "best method available." Mark relies on the following language from the Internal Revenue Service to support his argument:

> The formula approach [excess earnings approach] may be used in determining the fair market value of intangible assets of a business *only if there is not [a] better basis available* for making the determination.

IRS Rev. Rul. 68–609, *reprinted in* S. PRATT, VALUING SMALL BUSINESSES AND PROFESSIONAL PRACTICES 155,

---

[6] Stepzinski was asked the following at trial:

Q. You are of the opinion then that the lease for equipment and the lease for the real estate and the lease on the new computer have no value?

A. I guess I would say they have value.

[7] For example, Mark cites the following language from the Internal Revenue Service Conferee Valuation Training Program regarding the excess earnings methodology:

All that can be said for [the excess earnings method], or a similar formula method of capitalization using two rates of interest, is that you hope to get a good answer based upon two bad guesses. It is difficult enough to get one reasonably accurate rate of capitalization using normal appraisal methods. . . . To get two fairly accurate rates, one for tangibles and the other for intangibles, other than by the use of pure guesswork, is impossible.

*See* PRATT at 159.

Exhibit 12–1 (1986) (emphasis added) (hereinafter PRATT).

Mark argues that the "better basis available for making the determination" in this case is the two arm's length sales transactions pursuant to the buy-sell agreement that took place within three months of Mark's valuation date. Mark concludes that "it was an error to resort to an imprecise and speculative manner of valuation that would not be employed by a buyer and seller in negotiating a deal."

Despite Mark's attacks on the excess earnings methodology, the record indicates that it is an acknowledged method of placing a value on intangible assets. According to the IRS, it has been applied by tax practitioners and by members of the IRS since it was published, and the tax court has recognized it on occasion as a means of arriving at a fair market value. *See* PRATT at 159. Further, Mark's own expert admitted using the method in previous valuations and stated that the methodology was done correctly by Mueller.[8]

In addition, Mark's assertion that the sales transactions pursuant to the buy-sell agreement were "arm's length" and therefore provide the best valuation method is not immune to reasonable criticism either. In rejecting the notion that the buy-sell transactions

---

[8] Stepzinski was asked the following at trial:

Q. In any of your valuations that you have done in the past, have you ever utilized the excess earnings method?

A. Yes.

. . . .

Q. Is there a correct methodology that an accountant would employ in going through an excess earnings calculation?

A. Well. I think the methodology that Todd employed was correct. I mean, it was done correctly.

necessarily established the value, the trial court reasoned:

> While Dr. Wagner clearly agreed to some lesser amount it was also acknowledged that he received the additional benefit of being released from certain liabilities related [to] the partnership. This clearly gave him some benefit although the amount is unclear.
>
> The mere fact that Dr. Wagner agreed to a calculation that would have allowed for a substantially smaller payment than what is contemplated here, does not convince me that that is necessarily the proper payment. The testimony of Todd Mueller was convincing to me that to allow valuation on that basis would grossly undervalue this asset to the petitioner.

Also, as Maureen argues, Stepzinski appraised the businesses for the Wagner buy out as an employee of the Plymouth Clinic and the partnerships. It is entirely possible that Dr. Wagner failed to consider the value of intangibles such as the leases. The fact that Stepzinski, working as an agent of the partnerships, failed to value the leases in the Wagner buy out cannot be used to conclusively find that those same leases would not have some value to another willing buyer and seller.

■

A trial court in the exercise of its discretion is free to assess expert opinion and determine the fair market value of a business asset based upon the nature of the business. *See Arneson v. Arneson*, 120 Wis. 2d 236, 248–49, 355 N.W.2d 16, 22 (Ct. App. 1984). The trial court recognized the potential problems with the excess earnings method but concluded:

The petitioner has made substantial argument based on statements by the Internal Revenue Service and by Dr. Shannon Pratt attacking this method, but then offers nothing in return but to say that there is no value whatever in the leases that are held by this partnership.

The testimony of Todd Mueller goes a long way to calm any fears that I have in using this method to value the asset in question.

■

The trial court in this case properly weighed the expert testimony, considered all of the relevant evidence, and went through a rational decision-making process regarding the valuation of Associates. Accordingly, we conclude that the trial court properly exercised its discretion with regard to the valuation of Associates.

## B.   Accounts Receivable

We next consider whether Mark's accounts receivable from the Plymouth Clinic were properly classified by the family court as assets subject to property division and not anticipated income. Mark argues that including the accounts receivable in the property division results in unfairness to him because the money obtained from them plays a substantial role in his income.

■

Property division issues in a divorce are within the discretion of the trial court. *Weiss v. Weiss*, 122 Wis. 2d 688, 692, 365 N.W.2d 608, 610 (Ct. App. 1985). The general rule regarding the classification of accounts receivable is that they are to be considered assets subject to property division. *Hubert v. Hubert*, 159 Wis. 2d

493

803, 812, 465 N.W.2d 252, 255 (Ct. App. 1990); *see also Ondrasek*, 126 Wis. 2d at 476, 377 N.W.2d at 193.

However, the family court may in its discretion include accounts receivable as either an asset to divide or as salary. *See id.* at 479, 377 N.W.2d at 194. For example, we have held that accounts receivable should be excluded for asset valuation purposes when there is an agreement providing that, upon withdrawal, the shareholder will not be compensated for his interest. *Id.* at 476, 377 N.W.2d at 193. This would not apply in the case at bar, however, because Mark is entitled to be compensated upon leaving the clinic for his interest in the accounts receivable.[9]

We have also recognized that in fixing child support and maintenance, the family court can consider the accounts receivable as anticipated income when determining the party's ability to pay. *Hubert*, 159 Wis. 2d at 812, 465 N.W.2d at 255; *see also Johnson v. Johnson*, 78 Wis. 2d 137, 143, 254 N.W.2d 198, 201 (1977). In *Hubert*, the family court was confronted with the issue of the proper treatment of Dr. Hubert's accounts receivable from his medical practice. In considering the receivables as anticipated income, the court reasoned that if the receivables were treated as a divisible asset, Dr. Hubert's cash flow would have been adversely affected and he would not have the income sufficient to fulfill his professional and personal obligations. *Hubert*, 159 Wis. 2d at 813, 465 N.W.2d at 255.

In *Ondrasek*, the family court failed to consider the effect of the accounts receivable from the husband's law

---

[9] Mark concedes that his contract with the Plymouth Clinic allows him to recover his interest in the accounts receivable in equal installments over twenty-four months upon leaving the clinic.

practice for purposes of property division. This court stated that such a failure "could be salvaged . . . if adequate reasons were stated and findings made linking [the husband's] salary and ability to earn with the accounts receivable." *Ondrasek*, 126 Wis. 2d at 478, 377 N.W.2d at 193. In order to exclude the accounts receivable from the marital estate, there must be "sufficient reasons as to how the accounts receivable affected the findings as to [the husband's] ability to pay." *Id.* at 479, 377 N.W.2d at 194.

Therefore, according to *Hubert, Ondrasek* and *Johnson*, the trial court may in its discretion choose to exclude the accounts receivable from the marital estate if the evidence indicates that there is a link between the receivables and salary and that dividing the receivables would adversely affect the ability to pay support or maintain professional and personal obligations.

Mark argues that his salary is directly related to his receivables, and the receivables are in constant fluctuation and uncertainty. However, Maureen argues that the evidence shows that Mark has received a similar percentage of the gross billings in each quarter since 1989 and similar income, that the accounts receivable are static, and that Mark accumulates comparable receivables each year.

As was the case with the valuation of Associates, the family court was presented with two differing expert opinions regarding the accounts receivable and their relationship to Mark's income. The court in treating the receivables as a divisible asset reasoned as follows:

> If the court does not treat the accounts receivable as an asset there is a substantial likelihood that

the petitioner could retire from the practice of medicine with the accounts receivable for which he would be paid in an amount that would match or exceed the accounts receivable he had at the time that this marital estate was valued. Failing to include the accounts receivable in the property division would lead to an unfair situation for the respondent.

We conclude that the court properly exercised its discretion and therefore affirm the court's holding that the accounts receivable should be treated as an asset under the circumstances of this case.

Mark also argues that by treating the accounts receivable as an asset and using money received from them in calculating his monthly income, the trial court double counted the receivables. Accounts receivable cannot be counted twice. *Hauge v. Hauge*, 145 Wis. 2d 600, 606, 427 N.W.2d 154, 156 (Ct. App. 1988); *Peerenboom v. Peerenboom*, 147 Wis. 2d 547, 553, 433 N.W.2d 282, 285 (Ct. App. 1988).

While it is undisputed that the accounts receivable were included as an asset of the clinic, the record fails to establish a clearly identifiable relationship between the accounts receivable and Mark's salary. In addition to Mark's predetermined monthly salary of $4000, he also receives a "bonus" which the trial court concluded was $9500 a month. The bonus relates to the production of each doctor based upon gross billings. The actual bonus is apparently paid from the clinic's cash on hand. The accounts receivable are not apportioned and paid in advance. Therefore, while some of the bonus money is attributable to accounts receivable, the record does not establish the amount to any degree of certainty.

The facts in this case related to the question of double counting are analogous to those in *Hauge*, where we reasoned:

> Although [the husband] may collect a small portion of his income each year from accounts receivable, he apparently continues to accumulate a comparable receivable in each succeeding year. At the point of retirement or sale of his practice, he will be entitled to the outstanding accounts as an asset to replace those previously depleted through income.

*Hauge*, 145 Wis. 2d at 606, 427 N.W.2d at 156. Therefore, we conclude that the record fails to establish that the court double counted the accounts receivable.

*By the Court.*—Judgment affirmed.