IN RE the MARRIAGE OF:

Jerry J. GARCEAU, Petitioner-Respondent,

v.

BRENDA S. GARCEAU, n/k/a Depies, Respondent-
Appellant.

Court of Appeals

*No. 98–3241. Oral argument October 22, 1999.—Decided
December 1, 1999.*

2000 WI App 7

(Also reported in 606 N.W.2d 268.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of and oral argument by *Dawn M. Sabel* of *AA Sabel Law Office, S.C.* of Fond du Lac.

On behalf of the petitioner-respondent, the cause was submitted on the brief of and oral argument by *Bruce W. Elbert* of *Elbert, Pfitzinger & Byron* of Juneau.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. The question presented is whether an insurance company's termination benefits package, a type of deferred compensation plan, should be divided at the time of divorce as part of the marital estate. Unlike a pension, the plan does not set money aside in a pool designated for the benefit of the particular employee. Rather, the amount of the termination benefit is based on the agent's performance during the twelve months prior to termination and the number of years the agent has been with the company at the time of termination. The trial court found that "[t]here is no way that an amount can be arrived at with any degree of accuracy" and thus excluded the termination bene-

3

fits package from the property division. We realize that an estimate of these future benefits is by nature speculative. However, such is the case when dividing almost any retirement plan where future benefits are at issue. The termination benefits should have been included in the marital estate. We reverse that part of the judgment excluding the termination benefits package from the marital estate and remand with directions.

¶ 2.   Brenda and Jerry Garceau divorced after fourteen years of marriage. During the marriage, Jerry obtained his insurance license and at the time of the divorce he had worked as an American Family Life Insurance agent for almost ten years. It is Brenda who appeals from the judgment of divorce, claiming that the court erred in its property division. We called for oral argument on what we see as the novel issue in this case: should Jerry's termination benefits be included in the marital estate, and, if so, how should they be divided? After setting forth our standard of review, we discuss the disposition of the termination benefits and then dispose of Brenda's other arguments.

¶ 3.   Valuation and division of the marital estate at divorce are within the discretion of the trial court. *See Sharon v. Sharon,* 178 Wis. 2d 481, 488, 504 N.W.2d 415, 418 (Ct. App. 1993). Thus, we will uphold the trial court's determinations on valuation and division as long as "the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Long v. Long,* 196 Wis. 2d 691, 695, 539 N.W.2d 462, 464 (Ct. App. 1995). However, whether an asset is marital property subject to division under § 767.255, STATS., is a question of law

we review de novo. *See Lang v. Lang*, 161 Wis. 2d 210, 217, 467 N.W.2d 772, 774 (1991).

¶ 4.   Brenda first argues that it was error for the court to exclude Jerry's termination benefits plan from the marital estate. The plan determines Jerry's compensation when his relationship with American Family is terminated. When termination occurs, Jerry will receive extended earnings based on a percentage of renewal service fees earned during the twelve months prior to termination. The percentage varies with the number of years an agent is with American Family and the duration of payments depends on the agent's age at termination. An agent does not become eligible for extended earnings until he or she has been with American Family for ten years. As indicated above, the trial court found that any benefits Jerry might receive under the plan could not be calculated "with any degree of accuracy" and thus excluded the extended earnings from the marital estate. Brenda argues that this was error, as the extended earnings plan is akin to a pension and must, as a matter of law, be considered in the division of the marital estate. Jerry responds that case law pertaining to pensions has no application here, as his extended earnings are neither guaranteed nor able to be calculated at this time. He has no intention of terminating his relationship with American Family any time soon. Thus, what his renewal rate has been during the past twelve months (which is what Brenda's expert used to calculate the value of the extended earnings) does not, according to Jerry, predict what his renewals will be right before termination.

¶ 5.   As a threshold issue, we address the relevance of the fact that Jerry was not eligible for the plan until three days after the judgment of divorce was

entered. Under Wisconsin law, pension benefits are to be taken into consideration when the marital estate is divided, whether they have vested or not. *See* § 767.255(3)(j), STATS. The date upon which a spouse becomes eligible to receive benefits is just one of many factors for the trial court to consider when deciding how to divide the marital estate. *See Leighton v. Leighton*, 81 Wis. 2d 620, 635, 261 N.W.2d 457, 464 (1978) (the trial court must "evaluate the probability that the party who has a contingent right to a pension will eventually enjoy that [right]") (quoted source omitted). At the date of divorce, Jerry's eligibility to receive benefits at termination was only three days away. As of the date of oral argument, Jerry was still an agent for American Family. Now, there is no question that he is eligible for termination benefits. Thus, while in some cases remote eligibility would be a factor the court could consider in dividing a future benefit, uncertainty about eventual eligibility was not and is not a relevant factor here.

¶ 6.   For the same reasons consideration of a contingent interest is allowed, we reject Jerry's contention that the arguably speculative nature of the extended earnings bars their inclusion in the marital estate. In *Leighton*, our supreme court rejected a similar argument regarding unvested pension rights, stating that "the fact that the interest is contingent does not mean it may be ignored in property divisions in divorce actions." *Id.*; *see also* § 767.255(3)(j), STATS. (giving the trial court power to alter its equal division of property after considering several factors, including "pension benefits, vested or unvested, and future interests"). Section 767.255(3)(j)'s directive to consider both vested and unvested interests clearly rejects the idea that just because a future interest is contingent or speculative it should be excluded from the marital estate. As men-

tioned above, the uncertainty of actual receipt of retirement or termination benefits is a factor to be taken into account at their division. For example, in *Peterson v. Peterson*, 126 Wis. 2d 264, 376 N.W.2d 88 (Ct. App. 1985), we upheld the trial court's assignment of no value to a retirement plan where the plan would not vest for another twenty-plus years and the potential-beneficiary spouse was considering a new job due to the physically demanding nature of the work. *See id.* at 266, 376 N.W.2d at 89.

¶ 7.   Unlike the situation in *Peterson*, there was no evidence here that Jerry intended or intends to quit American Family. And, while we acknowledge that the extended earnings are not a pension plan, they are American Family's way of providing for its agents when their careers are over. As future benefits, they are similar enough to a pension plan to be treated like one when dividing the marital estate. Jerry points out that "he will not be terminating his employment with American Family Insurance for many years and, therefore, will not be receiving any benefit." But this is almost always the case when dividing postemployment benefits of a young person. Eventually, Jerry will receive some termination benefits. It is up to the trial court to determine what share of the marital portion of these benefits should go to Brenda.

[4]

¶ 8.   Other jurisdictions are in accord that extended earnings plans should be included in the marital estate. For example, in *Skaden v. Skaden*, 566 P.2d 249 (Cal. 1977), the California Supreme Court was confronted with a termination package similar to the one in this case. While the *Skaden* package based the termination benefits on premium collections instead of renewals, the idea is the same: when the agent termi-

nates, his or her benefits are based on the amount of account activity near the time of termination. The *Skaden* court likened the termination benefits to a pension plan and held that they "represent . . . a divisible property interest." *Id.* at 249. Likewise, in *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995), the court held that even though the value of termination benefits depends in part on the employee spouse's postdivorce activities, "we choose not to adopt the conclusion that, for that reason, the [spouse] should be denied any interest whatsoever in such a substantial asset." *See also Wade v. Wade*, 923 S.W.2d 735 (Tex. App. 1996). We agree that termination benefits are part of the marital estate.[1]

█

¶ 9.    Now that we have clarified that the extended earnings are a marital asset subject to division, we must turn to the complicated task of valuation and distribution. Valuation is within the discretion of the trial court. *See Bloomer v. Bloomer*, 84 Wis. 2d 124, 134, 267 N.W.2d 235, 240 (1978). However, the method of valuation must be logically sound. *See id.* at 132–34, 267 N.W.2d at 239–40 (rejecting present value discount when money being divided was not a projected future benefit). In *Bloomer*, our supreme court discussed valuation methods at length in order to guide trial courts in their exercise of discretion. *See id.* at 130–36, 267 N.W.2d at 238–41. *Bloomer* recognized three methods the trial court may use to evaluate a pension interest. When using the first method, the trial

---

[1] Indeed, our research revealed only one case where a plan similar to the one at issue was deemed not to be subject to division upon divorce. *See Lawyer v. Lawyer*, 702 S.W.2d 790 (Ark. 1986). We find no reasoning in *Lawyer* that prompts us to change our conclusion.

court determines the amount the pensioned spouse has contributed to the fund and awards a portion of that amount, along with any interest the contributions have accrued, to the nonpensioned spouse. The amount of this award is figured in with other divided property . when finalizing the divorce. The second method involves calculating the present value the future benefits will have when they vest and awarding that amount to the nonpensioned spouse. Under this · method, the court must take into account the life expectancy of the pensioned spouse and the probability that he or she might die before the benefits vest. These actuarial factors, along with the inherent uncertainty in discounting a future sum to present value, render this method the most speculative. *See id.* at 135, 267 N.W.2d at 241. The third alternative is for the trial court to determine a fixed percentage of any future benefits to be paid to the nonpensioned spouse if and when such benefits are paid to the pensioned spouse. *See id.* at 136, 267 N.W.2d at 241. This method does away with the uncertainty of method number two, but has the disadvantage of dragging out the proceedings. Finally, we note that the trial court is not tied to any one of these three methods; it may tailor its own solution based on the particular case, so long as the method used is "reasonably calculated to produce a fair result." *Ably v. Ably*, 155 Wis. 2d 286, 290, 455 N.W.2d 632, 634 (Ct. App. 1990).

¶ 10.   Jerry proposes a *Bloomer* number three approach with an added twist. Because his benefits are based on renewals of existing policies, Jerry reasons that Brenda should only get the benefit of those policies in effect at the time of the divorce. Otherwise she would benefit from Jerry's postdivorce activities. Jerry thus proposes that division be held open until termination

and at that time only those benefits attributable to renewals of policies in existence at the time of the divorce be split. While we do not discount Jerry's theory, we do not think it appropriate in this case for four reasons. First, this tracing method would allow an agent to manipulate his or her accounts so as to ensure a turnover in policies and thus no continuing renewals. We do not suggest that Jerry intends to do any such thing, but we hesitate to endorse a method that could encourage underhanded behavior between divorcing spouses. Second, Jerry's method would overlook retained customers who switch policies. For example, a customer at the time of the divorce might move, sell his or her car and/or change life insurance coverage between the time of the divorce and termination. None of the new policies would count under the tracing method, even though the customer's business was acquired during the marriage. Third, to prolong the asset division does not promote judicial administration. The judge presiding over the divorce now no doubt has a better handle on the parties' situation than will someone else decades down the road. Finally, and perhaps most importantly, it is not in the best interest of the parties to drag out the divorce. The tracing method would turn the final settlement into a lingering cloud on the parties' horizons. Jerry's tracing method would make more sense were the parties nearing retirement age. Here, drawing out the proceedings indefinitely will only cripple the parties' ability to get on with their lives.

¶ 11. While we conclude that Jerry's proposal is not appropriate in this case, it is for the trial court, not us, to choose among the other alternatives. If the trial court were to choose *Bloomer* approach number one, the method would have to be modified because Jerry

10

has not contributed funds to a pension plan. But he has accrued renewals over the last several years. Were he to terminate right now, his benefits would be based on last year's renewals. That amount would be the asset to be divided under *Bloomer* method number one: his benefit, had he been eligible and chosen to terminate on the date of the divorce. At oral argument, we informed the parties that we had researched the issue and found that industry groups estimate that, on average, from one year to the next there is a ninety-three percent renewal rate on existing policies.[2] Thus, if the trial court were to choose this method, it could incorporate an element of Jerry's tracing idea by excluding seven percent of his renewal benefits to account for attrition. Further reduction to account for taxes might also be appropriate.[3] This method of valuation would be advantageous for two reasons. First, it does not give Brenda credit for Jerry's postdivorce efforts; it is based on Jerry's renewals for the year before the divorce. Second, it gives the parties and the court finality. On the other hand, the benefits are not available to Jerry at this time. Therefore, depending on whether there are other liquid assets involved with which this amount due to Brenda could be set off, this method might prove impractical in this case.

---

[2] This figure was based on information supplied to the court by Professional Insurance Agents National in Alexandria, Virginia. At oral argument we asked the parties if they objected to our taking judicial notice of the accuracy of these figures and they said they did not.

[3] It appears that Brenda's expert discounted the benefit to present value. This was error: if we look at what Jerry could get were he to terminate today that amount is already at present value. *See Bloomer v. Bloomer*, 84 Wis. 2d 124, 133–34, 267 N.W.2d 235, 240 (1978).

11

¶ 12. Should the immediate award of Brenda's share prove impractical, the court could fashion a remedy along the lines of the other two *Bloomer* alternatives. The second alternative, admittedly speculative even in those cases where a fixed amount is paid in every year, would appear impractical in this case due to the added variable of future renewal rates. *Bloomer* method three, while it would draw out the proceedings, might be appropriate. Under that method, the court would fix a percentage of the termination benefits that would be awarded to Brenda if and when Jerry terminates his relationship with American Family. The trial court, much more familiar with the particulars of this case, will use its discretion on remand to develop the appropriate solution.

¶ 13. Jerry also argues that we should take into account Brenda's "attempt[ ] to get [Jerry] terminated from his employment with American Family Insurance during the course of the divorce proceedings." Brenda wrote to the Wisconsin Commissioner of Insurance and the Michigan Insurance Commission "regarding [Jerry's] illegal sales of life insurance in the State of Michigan." Jerry likens this to the wife's attempt to have her husband murdered in *Brabec v. Brabec*, 181 Wis. 2d 270, 510 N.W.2d 762 (Ct. App. 1993). Brenda replies that the facts here are not comparable to those in *Brabec* and that *Brabec* was about maintenance, not property division.

¶ 14. In *Brabec*, Diane contracted to have her husband, Todd, killed while child support, property division and maintenance were pending. The trial court did not award Diane maintenance, deeming her conviction for soliciting to murder Todd an "other factor" under § 767.26(10), STATS., "of sufficient weight to deny her support." *Brabec*, 181 Wis. 2d at 276, 510

N.W.2d at 764. On review, the court examined the "ambiguous legislative history" of the maintenance statute. *See id.* at 278, 510 N.W.2d at 765. The original bill had specifically forbidden the trial court from considering marital misconduct when determining maintenance, but that provision was deleted by amendment. *See id.* The court also contrasted the maintenance statute, § 767.26, which makes no mention of marital misconduct, with the property division statute, § 767.255, STATS., which expressly forbids its consideration. *See* § 767.255(3). Further, the court noted that, despite this history, our supreme court has held "the legislature did not intend to allow the circuit court to consider marital misconduct a relevant factor in granting maintenance payments." *Brabec*, 181 Wis. 2d at 278, 510 N.W.2d at 765 (quoting *Dixon v. Dixon*, 107 Wis. 2d 492, 505, 319 N.W.2d 846, 853 (1982)). The *Brabec* court distinguished *Dixon*, however, noting that Diane's attempt to have her husband killed was not "conduct against the marital relationship" while the marital misconduct in *Dixon*—adultery—was. *See Brabec*, 181 Wis. 2d at 279–80, 510 N.W.2d at 765. It concluded that Diane's conviction of solicitation of murder was a factor the trial court could consider in its maintenance determination. *See id.* at 282–83, 510 N.W.2d at 766.

¶ 15. Jerry analogizes Brenda's letter to Diane Brabec's murder contract. In support of his argument, he cites the trial court's statement to Brenda that "[f]rankly, the only moral is you could have killed the golden goose that lays the golden eggs. . . . You are asking this man for support and what you did was almost eliminate that possibility of his being in a position to . . . provide support . . . ." Jerry asserts that this resembles the *Brabec* court's statement that "if Diane

had been successful in her attempt to have Todd killed she would receive no maintenance at all." *Id.* at 279, 510 N.W.2d at 765. Jerry further argues that, like the conduct in *Brabec*, Brenda's letter was not conduct against the marriage; it was an attack on Jerry's livelihood intended to waste a marital asset. While the trial court did mention Brenda's letter, it did not include Brenda's action as a basis for the property division determination in its findings. Given this record, we need not discuss whether we think Brenda's actions constituted "marital misconduct," which would bar them from consideration under § 767.255(3), STATS. Nor need we decide, if they were not "marital misconduct," whether they were serious enough to warrant consideration as an "other factor" under § 767.255(3)(m). The severity of Brenda's actions and the weight, if any, to be given them when dividing the extended earnings are questions best left to the discretion of the trial court on remand.

¶ 16. Brenda's remaining arguments concern equalization credits connected to the property division and the valuation of the residence, business property and personal property. As stated above, valuation and division of property are matters within the discretion of the trial court. *See Sharon*, 178 Wis. 2d at 488, 504 N.W.2d at 418. Here, the findings demonstrate that the trial court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Long*, 196 Wis. 2d at 695, 539 N.W.2d at 464. We will not tamper with the valuation and division of the residence, business property and personal property.

¶ 17. In conclusion, we reverse that part of the judgment that excluded Jerry's termination benefits

from the marital estate. On remand, the trial court should use its discretion to reach an equitable division of that asset. We affirm all other portions of the divorce judgment.

Costs denied to both parties.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.