EQUITY ENTERPRISES, INC. and Equable Securities
Corp., Plaintiffs-Respondents,†

v.

Robert J. MILOSCH, Defendant-Appellant.

Court of Appeals

*No. 00–2827. Submitted on briefs May 11, 2001.—Decided July
11, 2001.*

2001 WI App 186

(Also reported in 633 N.W.2d 662.)

† Petition to review denied 10-23-01.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James W. Hammes* of *Cramer, Multhauf & Hammes, LLP*, Waukesha.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Michael H. Schaalman* of *Quarles & Brady, LLP*, Milwaukee.

Before Brown, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Robert J. Milosch appeals from a trial court judgment in favor of Equity Enterprises, Inc. and Equable Securities Corp. (Equable) validating a covenant not to compete in an employment contract between the parties and awarding Equable damages and attorney's fees in the amount of $137,851.99 because of Milosch's breach. Milosch argues that the trial court incorrectly concluded that a noncompete provision of the contract between the parties was valid and enforceable and that the trial court should not have granted Equable's summary judgment motion dismissing Milosch's counterclaim. We agree. Therefore, we reverse and remand.

### Facts

¶ 2. Milosch was an agent/employee of Equable for approximately fifteen years from 1982 until Febru-

ary 12, 1997. Equable sells insurance products and securities products. After terminating his employment with Equable, Milosch contacted Equable customers to solicit their business. On February 25, 1997, Equable filed an action in the circuit court of Waukesha county seeking to enforce a covenant not to compete contained in two employment contracts executed by Milosch and Equable on August 22, 1996. In its complaint, Equable sought to enforce the covenant not to compete contained in section 5.1 of each contract. Section 5.1 reads as follows:

> Restrictions on Competition. During Employee's employment with [Equable] and for a period of eighteen (18) months following the termination of Employee's employment with [Equable], Employee agrees that he shall not, except on behalf of [Equable], either directly or indirectly, in the same or substantially similar capacity in which he performed services for [Equable], whether as agent, stockholder (except as the holder of no more than five percent (5%) of the stock of a publicly held company provided Employee does not participate in the business of such company or render advice or assistance to it), employee, officer, director, trustee, partner, proprietor or otherwise:
>
> (a) Entice, or attempt to entice, any sales representative of [Equable] (whether such sales representative is an agent or employee of [Equable]) to terminate his employment or sever his relationship with [Equable], or to become associated with (as a representative, agent, consultant or otherwise) or employed by another person, firm or entity engaged in a business competitive with that conducted by [Equable], whether or not Employee is affiliated with such person, firm or entity; or
>
> (b) Do business with any Customer (as defined below) with respect to any form of insurance coverage

178

product competitive to that sold or offered by [Equable], or solicit or attempt to solicit any such Customer to do insurance business with a competitor of [Equable], even if Employee is not associated with such competitor. Employee recognizes and admits that the Customers are customers of [Equable], and the Employee agrees that, during his employment with [Equable] and the eighteen (18) month period following the termination of his employment with [Equable], he shall not interfere in any way with the relationship between the Customers and [Equable], nor shall he cause or attempt to cause any customer of [Equable] to cease doing business with [Equable] or to cause or attempt to cause such Customer to reduce the amount of business done with [Equable].

(c) For purposes hereof "Customer" shall mean any customer of [Equable] or any Related Party with whom Employee transacted business or whom Employee serviced on behalf of [Equable] during any part of Employee's employment. "Customer" shall exclude, however, those persons and entities to whom Employee sold any insurance coverage or securities product prior to his employment with [Equable], all of whom are listed on attached Exhibit A, if any.

¶ 3. On June 6, 1997, Milosch filed a counterclaim arguing that Equable had breached its employment contract and that under section 4.1 of the contract he is entitled to recover all subsequent or ongoing commissions or payments received by Equable, as those commissions or payments related to products Milosch sold during the course of his employment with Equable. Section 4.1 reads:

Vesting Upon Termination Due To Death, Disability, Retirement or After Ten Years of Service. Upon termination of employment for reasons of death or total and permanent disability of Employee, or termination on or

after ten (10) years of affiliation with [Equable] for reasons other than the commission of a prohibited act as defined in Paragraph 3.1 of this Agreement, all subsequently accruing commissions on policies, with respect to which Employee was entitled at the time of such termination shall be vested in and paid to Employee or his beneficiary, as the case may be, in the same manner as if this Agreement were still in effect.

¶ 4. Subsequently, an evidentiary hearing was held and the trial court entered a temporary order enjoining Milosch from violating the terms of section 5.1 in the two contracts during the pendency of the litigation. At the request of Equable, the trial court also entered an order bifurcating the case. If the covenants were found to be valid and enforceable, a second trial would be conducted with respect to any claim for damages asserted by Equable.

¶ 5. On August 6, 1997, following a two-day jury trial, the jury returned a special verdict finding that section 5.1 of the contracts was reasonable as to its time and geographic limitations, and otherwise complied with the requirements of WIS. STAT. § 103.465 (1999–2000).[1] Following the return of the special verdict, the trial court entered a judgment finding section 5.1 of the contracts to be a valid and enforceable covenant, and issued a permanent injunction enjoining Milosch from violating this provision of the contracts.

¶ 6. On November 3, 1997, Milosch filed a motion asking the trial court for entry of an order granting summary judgment dismissing Equable's claim for damages or, in the alternative, judgment on the pleadings. In support of his motion, Milosch submitted an

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

affidavit to the court wherein he asserted that renewal commissions due him under section 4.1 of the contracts would have resulted in payments being made to him by Equable in an amount of not less than $25,000 per year. Milosch further stated that although payments would continue on an indefinite basis, he believed that the commission payments would have continued for at least a period of ten years such that the total renewal commissions due him equaled or exceeded $250,000.

¶ 7. On February 20, 1998, the trial court issued a decision denying Milosch's motion for summary judgment. The trial court found that there were factual issues relating to the amount of damages, if any, Equable had suffered as a result of Milosch's breach of section 5.1 of the contracts, and that these issues needed to be resolved by a jury. Equable then filed a motion requesting that the trial court reconsider its decision of February 20, 1998, and enter an order granting summary judgment in favor of Equable dismissing Milosch's counterclaim. Equable argued that Milosch had forfeited his vested right to receive renewal commissions because of his postemployment competition, which was prohibited by section 5.1 of the contracts. In support of its contention, Equable argued that section 4.2 of the contracts required dismissal of the counterclaim. Section 4.2 reads:

Commissions After Other Termination. Upon termination of employment by either party for any reason other than those specified in Paragraph 4.1, above, Employee shall be entitled only to commissions accrued to the date of termination and shall not be entitled to any subsequently accruing commissions on policies. Upon termination of employment by reason of the Employee's commission of a prohibited act (as defined in Paragraph 3.1, above), or if subsequent to termination Employee

violates any of the provisions hereof, Employee shall forfeit any and all right to further commissions otherwise payable hereunder.

¶ 8. Agreeing with Equable's interpretation of section 4.2, the trial court ordered Milosch's counterclaim dismissed. The dismissal was entered on September 1, 1998. Following dismissal of his counterclaim, Milosch requested that the trial court refer the issue relating to Equable's claim for damages to the National Association of Securities Dealers (NASD), in accordance with NASD regulations which govern the conduct of both Equable and Milosch. Equable concurred with this request, and the trial court entered an order referring any remaining issues, as they related to damages, to NASD for arbitration proceedings.

¶ 9. Subsequently, a NASD arbitration panel awarded Equable damages in the amount of $74,927.15, and attorney's fees in the amount of $60,000. The trial court retained jurisdiction of the proceeding pending the conclusion of the arbitration. Upon application of Equable to affirm the NASD arbitration award, the trial court entered a judgment affirming the arbitration award on October 3, 2000.

¶ 10. Milosch appeals from the final judgment entered by the trial court on October 3, 2000. The issues raised on appeal relate to the trial court orders affirming the validity of section 5.1 of the contracts and dismissing Milosch's counterclaim based on its interpretation that section 4.2 is valid.

### Analysis

██

¶ 11. No extrinsic evidence was introduced to show the intent of the parties to the contract; therefore, our interpretation of the contract is a question of law

reviewed de novo. *RTE Corp. v. Md. Cas. Co.*, 74 Wis. 2d 614, 621, 247 N.W.2d 171 (1976). The issue presented is the enforceability under Wis. Stat. § 103.465 of sections 5.1 and 4.2 of the agency agreements between Milosch and Equable, which require that Milosch forfeit his renewal commissions if, after termination of the agreement, he engages in certain competitive practices. We conclude that sections 5.1 and 4.2 are unenforceable as an unreasonable restraint of trade and reverse the decision of the trial court.

■

¶ 12. We note that covenants not to compete are generally disfavored in the law. *Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki*, 2000 WI App 124, ¶ 8, 237 Wis. 2d 522, 614 N.W.2d 1, *rev'd on other grounds,* 2001 WI 51, 243 Wis. 2d 305, 627 N.W.2d 444. Such restrictions must withstand close scrutiny to pass legal muster as being reasonable; they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires. *Streiff v. Am. Family Mut. Ins. Co.*, 118 Wis. 2d 602, 611, 348 N.W.2d 505 (1984). The legislature codified this policy in Wis. Stat. § 103.465, which provides:

> **Restrictive covenants in employment contracts.**
> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

¶ 13. The language in section 5.1 of the contracts is functionally equivalent to the language our supreme court found unenforceable for overbreadth under Wis. Stat. § 103.465 in *Streiff*. *Streiff*, 118 Wis. 2d at 607.[2] In *Streiff*, the insurance company (American Family) refused to pay Streiff his "extended earnings," asserting that he had failed to comply with clauses 5h and 5i(4) of the employment contract.[3] *Id.* By the time the matter

---

[2] The applicable version of Wis. Stat. § 103.465 at the time of the supreme court's decision in *Streiff v. American Family Mutual Insurance Co.*, 118 Wis. 2d 602, 348 N.W.2d 505 (1984), was the 1981–82 version. The substance of § 103.465 has remained unchanged in the subsequent versions and is substantively unchanged in the 1999–2000 version we rely on here.

[3] Section 5h provided:

> After termination of this agreement, the agent shall refrain from further solicitation of policyholders for the company and from further servicing of policyholders of the company and for a period of one year after such termination anywhere within the radius of 50 miles from the location of the agent's place of business under this agreement on the date of such termination shall not induce or attempt to induce or cause another or others to induce or attempt to induce any policyholder to replace, lapse, or cancel any policy of insurance written by the company.

*Streiff*, 118 Wis. 2d at 605–06.

Section 5i(4) provided:

> If, while being paid extended earnings, the agent associates himself in any sales or sales management capacity with another insurer engaged in writing any of the kinds of insurance written by the company, and if the agent performs services in any such capacity for such other insurer within any of the States of the United States in which the company operates as a licensed insurer, the agent, from and after the date of such association, shall forfeit all his rights to extended earnings otherwise thereafter payable by the company.

*Id.* at 607.

came to court, American Family had decided not to rely on a violation of section 5i(4) as justification for nonpayment, and conceded that section 5i(4) was overly broad and unreasonable as to the territory described, that it violated § 103.465, and that it was unenforceable. *Streiff*, 118 Wis. 2d at 607. Section 5i(4) restricted a terminated agent from taking an employment opportunity in the insurance industry *in any state* of the United States in which the agent's former employer operated as a licensed insurer. *Id.* at 606–07.

¶ 14. The *Streiff* court refused to view section 5h separately from section 5i(4), holding that the two sections must be viewed together because they constituted an indivisible covenant governing several similar types of activities and establishing several time and geographical restraints. *Id.* at 613. Any part of an indivisible covenant, even if reasonable on its own, will not be given effect if any other part is unreasonable. *Id.* at 614–15. Thus, the supreme court, having agreed with American Family's concession that section 5i(4) was overly broad and unreasonable, held the entire covenant unenforceable. *Id.* at 615.

¶ 15. Here, section 5.1 implies a geographical restriction that is the functional equivalent to the prohibited geographical restriction in section 5i(4) of *Streiff*. Section 5.1 restricts Milosch from soliciting *any Equable customers* for a period of eighteen months after termination of employment. Section 5.1 is silent as to what territorial parameters Milosch must abide by, thereby implying at the least a nationwide restriction. Section 5.1 cannot escape the requirement of territorial reasonableness simply because it does not include any mention of geographical parameters. WISCONSIN

185

STAT. § 103.465 tells us that a covenant not to compete "within a *specified territory* and during a *specified time* is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal." *Id.* (emphasis added). Without any specified territory, section 5.1 is void. Like the unenforceable covenant in section 5i(4) of *Streiff*, the implication in section 5.1 is that Equable means to restrict its terminated agents from employment opportunities in the insurance and securities industry throughout this country. *See Streiff*, 118 Wis. 2d at 607. Therefore, because section 5.1 does not contain any geographical restrictions, section 5.1 fails and the jury finding that it was reasonable is an error of law.[4]

---

[4] The Wisconsin Supreme Court's decision in *Farm Credit Services of North Central Wisconsin, ACA v. Wysocki*, 2001 WI 51, 243 Wis. 2d 305, 627 N.W.2d 444, does not alter our conclusion that section 5.1 is an invalid covenant not to compete. In *Wysocki*, the supreme court held that where the covenant not to compete contains a restriction "narrowly tailored to a customer list," the lack of a geographical restriction is not fatal. *Id.* at ¶ 1. First, neither party has discussed the "customer list" restriction contained in section 5.1; we usually decline to sua sponte consider an issue not raised on appeal or in the trial court. *Schmitz v. Grudzinski*, 141 Wis. 2d 867, 876, 416 N.W.2d 639 (Ct. App. 1987).

Second, the "customer list" restriction in this case is far from being narrowly tailored. In *Wysocki*, the restriction prohibited Wysocki from contacting any client he had serviced in the year prior to his date of separation. *Wysocki*, 2001 WI 51 at ¶ 14. In another "customer list" restriction case, *Hunter of Wisconsin v. Hamilton*, 101 Wis. 2d 460, 304 N.W.2d 752 (1981), the supreme court approved a "customer list" restriction limited to customers serviced during a period which was the lesser of two years before the employee's termination or the employee's period of employment. *Id.* at 462–63. In contrast, the "customer

186

¶ 16. We now address section 4.2 of the contract. As a threshold issue, we hold that deferred commissions are the property right of the agent. They are not commissions belonging to Equable, as Equable contends; they are not a "reward" given by Equable at its discretion. We arrive at this conclusion by applying the analysis of *Garceau v. Garceau*, 2000 WI App 7, 232 Wis. 2d 1, 606 N.W.2d 268, where we treated extended earnings as a property right. *Id.* at ¶ 7. In *Garceau*, Brenda and Jerry Garceau divorced after fourteen years of marriage. *Id.* at ¶ 2. During the marriage, Jerry obtained his insurance license, and at the time of the divorce, he had worked as an American Family Life Insurance agent for approximately ten years. *Id.* Jerry had a termination benefits plan with American Family. *Id.* at ¶ 4. The plan determined Jerry's compensation upon termination of his relationship with American Family. *Id.* Upon termination, Jerry was slated to receive extended earnings based on a percentage of renewal service fees earned during the twelve months prior to termination. *Id.* At trial, the trial court held that Jerry's termination benefits package should not be divided at the time of divorce as part of the marital estate. *Id.* at ¶ 1. The trial court found that there was

list" restriction in this case prohibits Milosch from doing business with any customer of Equable whom Milosch serviced at any time during his employment with Equable. This restriction is unreasonable because it would prohibit Milosch from doing business with a customer he serviced during his first weeks of employment in 1982 who subsequently transferred his or her business to a competitor of Equable. Such an overbroad restriction is invalid because preventing Milosch from contacting former Equable customers is not reasonably necessary to protect Equable's legitimate business interests.

"no way that an amount can be arrived at with any degree of accuracy," and thus it excluded Jerry's termination benefits package from the property division. *Id.* Brenda appealed from the judgment of divorce, claiming that the trial court had erred in its property division. *Id.* at ¶ 2.

¶ 17. On appeal, we addressed whether Jerry's termination benefits should be included in the marital estate, and, if included, how the benefits should be divided. *Id.* We held that extended earnings, as future benefits, are similar to pension benefits. *Id.* at ¶ 7. Under Wisconsin law, pension benefits are to be taken into consideration when the marital estate is divided, whether they have vested or not. *Id.* at ¶ 5. We considered Jerry's extended earnings, which were based on a percentage of renewal service fees earned, to be a property right divisible in the marital estate. *Id.* at ¶ 6. Similarly, we hold that Milosch's deferred commissions, which are also based on a percentage of renewal service fees earned, are the property right of Milosch.

¶ 18. With that threshold issue addressed, we look to the language of section 4.2. Under our supreme court's decision in *Wassenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983), section 4.2 is a penalty provision which cannot stand. In *Wassenaar*, the issue was whether a stipulated damages clause in an employment contract constituted a liquidated damages clause or a penalty clause. *Id.* at 520–21. Liquidated damages clauses are a subset of stipulated damages clauses. A liquidated damages clause is the type of stipulated damages clause that a court holds to be reasonable and will enforce. *Id.* at 521. Penalty clauses are also a subset of stipulated damages clauses and are the type of

stipulated damages that a court holds to be unreasonable and unenforceable. *Id.*

¶ 19. The test that the trial court and the appellate court should apply in deciding whether a stipulated damages clause is valid is whether the clause is reasonable under the totality of the circumstances. *Id.* at 526. The reasonableness test is a compromise between two competing viewpoints toward stipulated damages clauses, one favoring enforcement of stipulated damages clauses and the other disfavoring such clauses. *Id.* at 528. The reasonableness test ensures that the court respects the parties' bargain, but prevents abuse. *Id.* at 529. Stipulated damages substantially in excess of injury justify an inference of unfairness in bargaining or an inference of an objectionable *in terrorem*[5] agreement designed to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective. *Id.* at 528–29.

¶ 20. Several factors are helpful in determining whether a particular stipulated damages clause is reasonable: "(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?" *Id.* at 529–30 (footnotes omitted).

---

[5] The definition of *in terrorem* is: "[Latin "in order to frighten"] By way of threat; as a warning." BLACK'S LAW DICTIONARY 825 (7th ed. 1999).

¶ 21. The determination as to whether a stipulated damages clause is valid presents a question of law. *Id.* at 523–24. In our evaluation of section 4.2, we note that the reasonableness of a stipulated damages clause cannot be determined by a mechanical application of these three factors. *Id.* at 533. In ruling on the reasonableness of a stipulated damages clause, a court should take into account these three factors along with the competing policies that gave rise to the adoption of the reasonableness test as the test for distinguishing between enforceable liquidated damages provisions and unenforceable penalty provisions. *Id.*

¶ 22. In determining whether a particular clause is reasonable, the first factor—whether the parties intend to provide for damages or for a penalty—is only slightly helpful because the subjective intent of the parties has little bearing on whether the clause is objectively reasonable. *Id.* at 530. In short, the label the parties apply to the clause, which might indicate their intent, does have some evidentiary value, but it is not conclusive. *Id.* We agree with Milosch that the plain language of the contract at issue here implies a penalty rather than a liquidated damage. The parties did not use either the term "damages" or "liquidated damages." Rather, the parties used the term "forfeit" to describe the consequences of a postemployment breach of contract. Although not conclusive, we can infer that the intent of the parties was that the forfeiture would constitute a penalty and was intended to punish an employee who violated any provision of the contract subsequent to termination of the contract.

190

¶ 23. The second factor—whether the injury caused by the breach is one that is difficult or incapable of accurate estimation at the time of contract, sometimes referred to as the "difficulty of ascertainment" factor—is more reliable and has several facets. *Id.* at 530–31. "These facets include the difficulty of producing proof of damages at trial; the difficulty of determining what damages the breach caused; the difficulty of ascertaining what damages the parties contemplated when they contracted; the absence of a standardized measure of damages for the breach; and the difficulty of forecasting, when the contract is made, all the possible damages which may be caused or occasioned by the various possible breaches." *Id.* at 531.

¶ 24. We hold that the amount of damages in the case of an alleged breach is ascertainable. We point to the fact that Equable originally had an expert witness prepared to testify as to the damages sustained by Equable as a result of Milosch's solicitation of Equable's clients subsequent to the termination of the employment contract. Later, the expert's report was used as a basis in the arbitration proceeding to assess actual damages of $74,927.15. The ability to put a figure on actual damages persuades us that the breach of contract on which this action is premised is not based upon circumstances that make it difficult or impossible for a party to accurately estimate its alleged damages.

¶ 25. The third factor in determining whether a clause is reasonable asks whether the stipulated damages are a reasonable forecast of the harm caused by the breach. *Id.* If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties'

original expectations were unreasonable. *Id.* at 532. The actual damages in this case, after the arbitration proceeding, were determined to be $74,927.15. Milosch contends that he would have received renewal commissions on an indefinite basis, and that in the first ten years following termination of the contract, those renewal commissions would have exceeded $250,000.00. If Milosch is correct, his forfeiture of this $250,000.00 was approximately three and one-half times the actual damages sustained by Equable. We will leave this determination to the trial court on remand, with the caveat that a forfeiture in an amount three and one-half times the actual damages should be closely scrutinized when deciding whether it qualifies as "substantially in excess of [the] injury" alleged to have been sustained by Equable. *Id.* at 528.

¶ 26. Having established that sections 5.1 and 4.2 are each invalid when analyzed separately, we additionally conclude under *Streiff* that these sections are intertwined and indivisible because they govern similar types of activities and establish time and geographical restraints. *See Streiff*, 118 Wis. 2d at 613. As discussed earlier, section 5.1 is a covenant not to compete and is unreasonably silent as to geographical restrictions. Similarly, section 4.2 functions as a covenant not to compete because it encompasses all sections of the contract by reference and thus encompasses the unreasonable geographical restriction in section 5.1.

¶ 27. In other words, section 4.2 provides that the agent must comply with all the terms and conditions of the entire agreement in order to receive "further commissions otherwise payable hereunder." Thus, section 4.2 requires as a condition for receiving payments of renewal commissions that the terminated agent comply

with all other sections, which includes section 5.1. The two sections must be read together. When read together, sections 5.1 and 4.2 place substantially similar restraints on Milosch vis-à-vis Equable and make him subject to forfeiture of renewal commissions if he violates any of the restraints. Like the restraints in *Streiff*, these restraints are indivisible and unreasonable for overbreadth.

¶ 28. In sum, the contracts between Milosch and Equable contain two indivisible and unreasonable covenants not to compete. We therefore reverse so much of the judgment giving Equable actual damages and attorney's fees. We reinstate Milosch's counterclaim for his deferred commissions and remand to the trial court for a hearing limited to a determination of the amount of deferred commissions to which Milosch is entitled.

*By the Court.*—Judgment reversed and cause remanded.

¶ 29. BROWN, P.J. *(concurring)*. I agree with the majority that the noncompete clause is invalid. In my view, if the noncompete clause is invalid, then Milosch has not violated any condition of the contract. If Milosch has not violated a valid condition of the contract, section 4.2, which allows forfeiture of renewal commissions upon violation of the contract, may not be invoked. Therefore, Equable cannot use section 4.2 to relieve itself from paying further commissions to Milosch for the simple reason that Milosch has not

violated any valid covenant of the contract. Thus, all of the majority's discussion taking place after holding that section 5.1 is invalid, is unnecessary.[1]

---

[1] If on further review, the supreme court were to find that section 5.1 is valid, then I think it is important to state my agreement with the majority that section 4.2 is a penalty clause.