STAR DIRECT, INC.
d/b/a Star Distributing,
Plaintiff-Appellant-Petitioner,

v.

Eugene DAL PRA,
Defendant-Respondent.

Supreme Court

*No. 2007AP617. Oral argument September 12, 2008.
—Decided July 14, 2009.*

2009 WI 76

(Also reported in 767 N.W.2d 898.)

For the plaintiff-appellant-petitioners there were briefs by *Robert E. Shumaker* and *DeWitt Ross & Stevens S.C.,* Madison, and oral argument by *Robert E. Shumaker.*

For the defendant-respondent there was a brief by *Gregory P. Seibold* and *Murphy Desmond S.C.,* Madison, and oral argument by *Gregory P. Seibold.*

¶ 1. MICHAEL J. GABLEMAN, J. This is a review of an unpublished decision of the court of appeals, which affirmed in part a judgment and order of the Circuit Court for Rock County, Daniel T. Dillon, Judge.[1] Star Direct, Inc. d/b/a Star Distributing ("Star Direct") sued a former employee, Eugene Dal Pra ("Dal Pra"), for breach of two non-compete clauses. The "business clause" non-compete provision prohibited Dal Pra's engagement in a "substantially similar or competitive" business within his prior assigned sales territory. The "customer clause" non-compete provision barred Dal Pra from interfering with or endeavoring to entice away current and recent past customers for whom he had performed services, with whom he had dealt, or about whom he had obtained special knowledge over the course of his employment. The contract also contained a "confidentiality clause" that barred Dal Pra from

---

[1] *Star Direct, Inc. v. Dal Pra,* No. 2007AP617, unpublished slip op. (Wis. Ct. App. Dec. 6, 2007).

disclosing or using certain information such as confidential marketing techniques, customer lists, and trade secrets.

¶ 2. Both Dal Pra and Star Direct moved for summary judgment. The circuit court denied Star Direct's motion and granted Dal Pra's motion, concluding that all three restrictive covenants were unreasonable and therefore unenforceable. The circuit court also concluded that each one of the clauses was indivisible from the others.

¶ 3. The court of appeals agreed with the circuit court that the business clause was unenforceable. It also agreed that the business clause was indivisible from the customer clause, and thus both clauses were unenforceable. The court of appeals did not separately address the reasonableness of the customer clause, nor did it address the reasonableness of the confidentiality clause or its divisibility from the other clauses. *Star Direct, Inc. v. Dal Pra,* No. 2007AP617, unpublished slip op. (Wis. Ct. App. Dec. 6, 2007).

¶ 4. The issues in this case fall into two categories. The first set of issues relates to the enforceability of each of the three clauses—the business clause, the customer clause, and the confidentiality clause. The question for each is whether it is "reasonably necessary for the protection of the employer." Wis. Stat. § 103.465[2]

---

[2] Wisconsin Stat. § 103.465 states as follows:

**Restrictive covenants in employment contracts.** A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable

(2007—08).[3] The second set of issues relates to the divisibility of the clauses. We must determine whether the otherwise reasonable and enforceable clause or clauses are divisible from the unenforceable clause or clauses and therefore independently enforceable.

¶ 5. We conclude that the customer and confidentiality clauses are reasonably necessary to protect Star Direct and therefore enforceable. The business clause, however, is overbroad and unenforceable. We also hold that the customer and confidentiality clauses are divisible from the business clause and enforceable on their own terms. We thus affirm in part and reverse in part the decision of the court of appeals, and remand this cause to the circuit court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶ 6. Star Direct engages in the business of distributing assorted novelties and sundries[4] to convenience stores, service stations, truck stops, and travel centers throughout the Midwest. This business is competitive, and its business model is premised on the relationship between route salespeople and their customers. The route salespeople regularly visit customers and potential customers, work to understand their customer's business, and endeavor to build long-term personal and professional relationships with them.

restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

[3] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[4] For example, cigarette lighters, gloves, sunglasses, aspirin, ice scrapers, combs, batteries, vitamins, cigarette papers, condoms, cameras, toys, and figurines.

¶ 7. Dal Pra was a route salesperson employed by CB Distributors until his route was purchased, along with one other route, by Star Direct. Star Direct wished to retain the business on these routes, so it offered Dal Pra what he admitted was a "very good package." This employment offer included servicing a nearly identical route—the area within a 50–mile radius of Rockford, Illinois—as well as a $30,000 bonus upon the completion of 30 months of service. Dal Pra accepted the offer.

¶ 8. One condition of Dal Pra's employment was the inclusion of three restrictive covenants in his employment contract prohibiting Dal Pra from certain post-termination activities. Two of the restrictive covenants are contained in separate paragraphs of Section II.D. of the employment contract, entitled "Non-Compete." A third restrictive covenant is contained in the immediately succeeding Section II.E., labeled "Confidentiality."

¶ 9. The first paragraph of Section II.D. contains what has been called the "customer clause." It begins by restricting Dal Pra from becoming "engaged in the business of the Employer, that being the distribution of consumer products to service stations and/or convenience stores" while employed with Star Direct. The paragraph then continues with the following post-termination stricture:

> [F]or twenty-four (24) months, after termination of Employee's employment with Employer, Employee shall not interfere with, or endeavor to entice away from Employer any person, firm, corporation, partnership or entity of any kind whatsoever which is a customer of Employer or CB Distributors, or which was a customer of Employer or CB Distributors within a period of time of one year prior to the termination of Employee's employment with Employer, for which Em-

283

ployee performed services or otherwise dealt with on behalf of Employer or CB Distributors or relative to which Employee obtained special knowledge as a result of his position with Employer; and Employee shall not approach any such customer or past customer for any such purpose or knowingly cooperate with the taking of any such action by any other person, firm, corporation, or entity of any kind.

¶ 10. The next paragraph in Section II.D. contains what has been called the "business clause":

[F]or a period of twenty-four (24) months after termination of Employee's employment with Employer, Employee shall not, directly or indirectly . . . become engaged in any business which is substantially similar to or in competition with the business of the Employer, within a fifty (50) mile radius of Rockford, Illinois.

¶ 11. Section II.E. contains the "confidentiality clause," providing as follows:

Independent of any obligation under any other Paragraph of this Contract, Employee shall not, at any time during the term of his employment with Employer and for a period of twenty-four (24) months following the termination of his employment with Employer, regardless of who initiated the termination, communicate, divulge or disclose for use by himself or any other person, firm, corporation, partnership, joint venture, association or other entity whatsoever, any information or knowledge, known, disclosed or otherwise obtained by him during his employment by Employer or CB Distributors, including but not limited to information and knowledge conceived, discovered or developed by Employee or CB Distributors and including but not limited to any of Employer's or CB Distributors proprietary products or procedures, any of Employer's or CB Distributors trade secrets, any of Employer's or CB Distributors customer lists, or any of Employer's or CB

284

Distributors marketing techniques which are not generally known in the business community, and which relate to the business of the Employer or CB Distributors or are in the nature of trade or business secrets of Employer or CB Distributors. Employee shall not at any time, during the period of his employment with Employer or at any time thereafter, copy, reproduce, retain, communicate, divulge or disclose to any other party the contents of the mailing list(s) of any of Employer's or CB Distributors customers . . . . Employee will have special pricing information and information regarding how Employer prices various products. This information is specifically held by both parties to be confidential. In no event shall Employee reveal this information to any other employer or other entity.

¶ 12. Dal Pra worked for Star Direct for roughly four years, receiving the $30,000 bonus after 30 months of service. Dal Pra voluntarily quit his employment with Star Direct on August 11, 2006, and immediately began his own distribution company. It is undisputed, at least for purposes of our review on summary judgment, that Dal Pra's new company sold various products to convenience stores, gas stations, and truck stops within 50 miles of Rockford, Illinois, and that some of the convenience stores Dal Pra sold to were past and/or current customers of Star Direct. We also take as true Star Direct's claims that it lost customers as a result of Dal Pra's competing business.

¶ 13. Star Direct sued Dal Pra on September 5, 2006, for breach of the business and customer clauses, seeking both damages and injunctive relief to prevent Dal Pra's continued alleged breach.

¶ 14. On cross motions for summary judgment, the circuit court concluded that the business, customer, and confidentiality clauses were all unreasonable and

therefore unenforceable.[5] The circuit court also concluded that each of the three clauses was indivisible from and "inextricably entwined" with the other two under *Streiff v. Am. Family Mut. Ins. Co.*, 118 Wis. 2d 602, 348 N.W.2d 505 (1984).

¶ 15. The court of appeals agreed with the circuit court that the business clause was unreasonable because it barred Dal Pra from engaging in a "substantially similar" business whose products are not competitive with Star Direct. *Star Direct, Inc.*, No. 2007AP617, unpublished slip op., ¶ 17. The court of appeals also examined the divisibility question. Applying *Streiff* as interpreted by *Mut. Serv. Cas. Ins. Co. v. Brass*, 2001 WI App 92, 242 Wis. 2d 733, 625 N.W.2d 648, the court of appeals concluded that the business clause was indivisible from the customer clause, and thus neither was enforceable. *Id.*, ¶ 29. The court of appeals did not evaluate the reasonableness of the customer clause on its own, nor did it address the reasonableness of the confidentiality clause or its divisibility from the business and customer clauses. *Id.*, ¶ 18 n.5, ¶ 28.

¶ 16. Judge Vergeront, who authored the majority opinion for the court of appeals, also wrote a separate concurrence in which she characterized *Brass*'s interpretation of *Streiff* as an "overly broad construction" that "will result in treating as one indivisible covenant practically all clauses restraining competition in an employment agreement." *Id.*, ¶¶ 32–33. Judge Vergeront indicated that in her reading, *Streiff* did not articulate a broadly applicable standard or test for indivisibility. *Id.*, ¶ 32. The particular provisions at

---

[5] It is not entirely clear from the record why the circuit court made a determination on the confidentiality clause when Star Direct's complaint only alleged a violation of the business and customer clauses.

issue in *Streiff*, she explained, were indivisible because they were expressly linked by the language in the other provisions such that compliance with one provision was required for receipt of benefits under another. *Id.*, ¶¶ 31–32. She noted, however, that the court of appeals must follow its own published precedent according to *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997), even if it disagrees with it. *Id.*, ¶ 30.

¶ 17. Star Direct petitioned this court for review, and both parties have presented arguments in their briefs regarding the enforceability and divisibility of each of the business, customer, and confidentiality clauses.

## II. STANDARD OF REVIEW

¶ 18. This case was determined on cross summary judgment motions on undisputed facts. Therefore, we review the issues of law decided by the circuit court de novo. *See LaCount v. Gen. Cas. Co. of Wis.*, 2006 WI 14, ¶ 20, 288 Wis. 2d 358, 709 N.W.2d 418. Restrictive covenants not to compete are contracts, the interpretation of which is a matter of law also reviewed de novo. *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 836, 520 N.W.2d 93 (Ct. App. 1994). This case further requires us to interpret and apply Wis. Stat. § 103.465, which governs the enforceability and divisibility of restrictive covenants. We interpret statutes independently, but benefit from the analysis of the previous courts. *Spiegelberg v. State*, 2006 WI 75, ¶ 8, 291 Wis. 2d 601, 717 N.W.2d 641.

## III. ANALYSIS

¶ 19. Restrictive covenants in Wisconsin are prima facie suspect as restraints of trade that are disfavored at law, and must withstand close scrutiny as

to their reasonableness. *Streiff,* 118 Wis. 2d at 611. They are not to be construed to extend beyond their proper import or farther than the contract language absolutely requires. *Id.* Rather, they are to be construed in favor of the employee. *Id.*

■■

¶ 20. Wisconsin Stat. § 103.465 governs the enforceability of restrictive covenants. It contains two main principles. First, pre- and post-termination noncompete agreements are "lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer." We have interpreted this as establishing five prerequisites that a restrictive covenant must meet in order to be enforceable under Wisconsin law. A restrictive covenant must: (1) be necessary for the protection of the employer, that is, the employer must have a protectable interest justifying the restriction imposed on the activity of the employee; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy. *Lakeside Oil Co. v. Slutsky,* 8 Wis. 2d 157, 162–67, 98 N.W.2d 415 (1959). The employer has the burden of proof as to the reasonableness of the noncompete. *NBZ, Inc.,* 185 Wis. 2d at 840.

¶ 21. The second principle in Wis. Stat. § 103.465 is that "[a]ny covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint."

¶ 22. We begin our discussion by examining the enforceability of each of the clauses, ultimately concluding that the business clause is unreasonable and unenforceable, but that the customer and confidentiality clauses are reasonable and enforceable. Then, we dis-

cuss the divisibility of the clauses, concluding that each of the clauses is divisible from the others.

## A. The Enforceability of the Restrictive Covenants

### 1. The Customer Clause

¶ 23. The customer clause prohibits Dal Pra, for 24 months following termination, from interfering with or endeavoring to entice away a person or entity "which is a customer" or "which was a customer . . . within a period of time of one year prior to . . . termination." The clause further specifies that prohibited customers are those "for which Employee performed services or otherwise dealt with" or "obtained special knowledge" about in the course of employment. The provision also prohibits Dal Pra from approaching "any such customer or past customer" for prohibited purposes or cooperating with others toward that end.

¶ 24. This provision, then, expressly prohibits interfering with or attempting to entice away: (1) current customers of Star Direct that Dal Pra serviced, dealt with, or obtained special knowledge about during his employment, and (2) those who were customers during the year prior to Dal Pra's termination ("past customers") whom Dal Pra serviced, dealt with, or obtained special knowledge about during his employment.

¶ 25. The circuit court concluded that the customer clause is unenforceable because Star Direct has no legitimate interest in restricting interference with past customers—interpreted as those who no longer do business with Star Direct. The court of appeals did not address the enforceability of the customer clause because it concluded that it was indivisible from the unenforceable business clause. *Star Direct, Inc.,* No. 2007AP617, unpublished slip op., ¶¶ 28–29.

¶ 26. Dal Pra finds the customer clause objectionable for three reasons. First, he argues that Star Direct has no legitimate protectable interest in prohibiting solicitation of past customers. Second, Dal Pra maintains that the provision unreasonably prohibits contact with customers—both current and past—whom Dal Pra may not have been in contact with for years. Third, he alleges that Star Direct's failure to systematically obtain restrictive covenants shows that they are not necessary for its protection. These objections are addressed to the first of the *Lakeside Oil* criteria, that is, whether the restrictions are necessary for Star Direct's protection. *Lakeside Oil,* 8 Wis. 2d at 163. The parties do not seriously dispute the clause's sufficiency under the remaining *Lakeside Oil* criteria.

¶ 27. To address these questions, we first look at Star Direct's protectable interests as a general matter and how they interact with the facts of this case. Second, we address Dal Pra's assertion that Star Direct has no interest in its past customers. Third, we address Dal Pra's contention that Star Direct has no interest in prohibiting competition with customers whom Dal Pra may not have serviced or interacted with for years. Finally, we discuss Dal Pra's contention that Star Direct did not systematically obtain non-compete agreements from its route salespeople, demonstrating the lack of a protectable interest. We ultimately conclude that the customer clause is reasonable and enforceable.

a. Star Direct's Protectable Interests Generally

¶ 28. Dal Pra was a route salesperson in a very competitive business. Route salespeople generally pose an elevated threat to the employer's business due to the special personal relationships, rapport, and goodwill they develop with the employer's customers while in the

employer's service. *See id.* at 163–64; *Chuck Wagon Catering v. Raduege,* 88 Wis. 2d 740, 752–54, 277 N.W.2d 787 (1979); *see also Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 214–16, 267 N.W.2d 242 (1978) (describing the special need for protection from route salespeople, but concluding that the former employee was akin to a non-route salesperson). In the "typical and classical case of a route customer" and salesperson, "it is assumed that . . . a special personal relationship will develop which will continue even though the salesman should commence his own enterprise or switch employers." *Gary Van Zeeland Talent, Inc.,* 84 Wis. 2d at 215.

¶ 29. This was true with Dal Pra. Star Direct invested in Dal Pra, giving him a platform from which to foster, nurture, and cultivate his customer contacts and relationships. Star Direct used marketing dollars to promote Dal Pra and sent him to industry events that further enhanced his ability to develop customer relationships. The record is clear that this was and is a fiercely competitive, relationship-based business. The customers he dealt with, then, were not simply buying product based on price or other objective factors. As Bradley Son, Star Direct's President, made clear in his affidavit, personal and professional rapport between salespeople and customers is essential to a successful and profitable business. *See Lakeside Oil,* 8 Wis. 2d at 159–60 (upholding the reasonableness and enforceability of a restrictive covenant against a former route salesperson where "[c]ustomers were obtained primarily upon the basis of the defendant's personal salesmanship and the faith and trust the defendant could engender in the customer").

¶ 30. In addition to the relationship-based nature of the business, Dal Pra's employment positioned him

<br>

to obtain certain knowledge[6] regarding the specific needs and wants of his customers, the pricing of Star Direct's products, Star Direct's costs, and the profit margins Star Direct earned on certain products. Dal Pra, in our opinion, fits the classic description of the route salesperson, whose base of information and relationships could constitute a threat to Star Direct.

### b. Star Direct's Interests in Prohibiting Competition with its Past Customers

¶ 31. The customer clause prohibited Dal Pra from contacting "past customers," defined as those who purchased from Star Direct within one year prior to his termination. Dal Pra asserts that Star Direct does not have a legitimate protectable interest in these past customers. The circuit court agreed, and so does the dissent.

¶ 32. No Wisconsin case has explicitly addressed or affirmed an employer's interest in customers who have recently chosen to cease doing business with the employer. However, Wisconsin courts, including this court, have reviewed provisions that clearly apply to past customers, and have been untroubled by this asserted interest.

¶ 33. In *Rollins Burdick Hunter of Wis., Inc. v. Hamilton*, 101 Wis. 2d 460, 304 N.W.2d 752 (1981)

---

[6] The customer clause limits the customer restrictions to past or current customers whom Dal Pra serviced, dealt with, or obtained special knowledge about as a result of his employment with Star Direct. Dal Pra does not contend that the phrase "special knowledge" renders the customer clause void for vagueness. His concerns, as noted above, are directed to the question of whether Star Direct has a protectable interest in such customers.

(hereafter "*Hamilton*"), this court considered a restrictive covenant that prohibited the two defendant employees from soliciting, contacting, or doing "any competitive business with" anyone who had been a customer of the company during the two years preceding termination or the period of their employment, whichever was shorter. *Id.* at 462–63. Because the employees worked for more than two years, the two-year timeframe was applicable. *Id.* During those two years preceding termination, the employer had over 6,000 customers, only 175 of which had contact with the defendant employees. *Id.* at 463. Though the court did not discuss it, such a customer pool certainly could have included customers who had chosen to take their business elsewhere. Thus, this provision prevented the employees from contacting both current and past customers with whom they may or may not have had contact. It bears reminding that the two-year timeframe here is one year longer than the provision in the case at bar.

¶ 34. The litigants and the courts were primarily concerned that this prohibited contact with customers the employees may not have serviced at all. *Id.* at 463–64. On review, we determined that the employer may have a legitimate protectable interest where the employees had access to important customer information, even if they did not personally have contact with those customers. *Id.* at 468–69. Though not ultimately determining whether the provision was valid, we reversed the court of appeals and circuit court who had previously found the provision invalid. *Id.* at 471–72.

¶ 35. A similar restrictive covenant was at issue in *Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki*, 2001 WI 51, 243 Wis. 2d 305, 627 N.W.2d 444. In that case, for one year following termination, an employee

who provided accounting, bookkeeping, and tax preparation assistance was prohibited from engaging in the same business activities with persons the employee consulted or serviced "at any time during the one year immediately prior to the date of separation." *Id.*, ¶ 4. Again, though not discussing this point, the total world of possible customers that the employee could not contact included customers who may have chosen to no longer do business with the employer. We concluded that such a restriction was not invalid per se, and remanded to the circuit court for further fact-finding. *Id.*, ¶ 16.

¶ 36. In a similar court of appeals case, the court determined that a restrictive covenant prohibiting, among other things, interference with a client who was a customer during the past two years, was reasonable as a matter of law. *Techworks, LLC v. Wille,* 2009 WI App 101, ¶ 6, 318 Wis. 2d 488, 770 N.W.2d 727. Though again not discussed in the court's analysis, this provision includes customers who may have chosen to take their business elsewhere during the previous two years, and the court determined this provision was enforceable.

¶ 37. As this brief review of the case law shows, Wisconsin courts and litigants have been untroubled by an employer's asserted interest in its recent past customers. While these cases do not settle the matter, the customer clause is distinguishable from these other cases only in that it expressly divided the customers into two identifiable groups—current and past customers. This brings the issue to the fore, and the question is does Star Direct have that interest vis-à-vis Dal Pra?[7]

---

[7] The dissent argues that our review of the case law "assumes that silence on an issue signals the court's approval." Dissent, ¶ 106. The dissent's arguments against such an inter-

¶ 38. Star Direct does have an interest in prohibiting the solicitation of its recent past customers. First, Dal Pra obtained significant knowledge regarding Star Direct's business that could be used against Star Direct. If not prohibited, Dal Pra would be able to approach these customers with knowledge of Star Direct's prices and pricing strategies, proprietary marketing techniques, and profit margins. He would have all the information a competitor would want and need to know to effectively undercut Star Direct.

¶ 39. Second, through his employment and because of Star Direct's investment in him, Dal Pra would, as the customer clause so states, have serviced, dealt with, or have special knowledge about these customers. He would know their specific needs and product desires, and would have a relationship history with many of them. This would place him in a far better position than an ordinary competitor, and give him a distinct advantage.

---

pretive approach are strong, but are simply inapplicable here. The dissent has misread our discussion of these cases.

The point of our review of the case law is far more limited than the dissent claims. We explicitly state that these cases do *not* settle the matter. The cases in fact do show both that courts and litigants have not flagged the implicit asserted interest in past customers, and that this sort of provision is not really all that unique. Moreover, our conclusion that Star Direct does have an interest in past customers is explained infra ¶¶ 38–41. In none of these paragraphs do we cite the cases just discussed for authority.

Finally, the dissent suggests that our analysis of case law in *Horst v. Deere & Co.*, 2009 WI 75, 319 Wis. 2d 147, 769 N.W.2d 536 is inconsistent with the analysis today. That assertion is mistaken because, in today's majority opinion as in *Horst,* the court concluded that while the language · in prior cases was suggestive, no case directly answered the question before the court. The analysis performed in each majority opinion is the same.

¶ 40. Finally, Star Direct does have a general interest in winning back the business of its recent past customers. The record shows this is a relationship-based and highly competitive business. It takes significant effort and investment to win customers. These past customers may have chosen to take their business elsewhere only temporarily, and would still have a history with Star Direct. While an employer's prospects of rekindling customer relationships fades considerably over 15 years (as in *Equity Enters., Inc. v. Milosch,* 2001 WI App 186, 247 Wis. 2d 172, 633 N.W.2d 662), we believe under the facts of this case that an employer is entitled to an opportunity to recoup the considerable investment of resources it made in developing and fostering customer relationships and business opportunities that were active as recently as one year prior to the employee's termination.

¶ 41. For the reasons articulated above, Dal Pra would not simply be engaging in ordinary competition with Star Direct if permitted to interfere with recent past customers. He would have a distinct competitive advantage, and this advantage would be detrimental to Star Direct's business. We render no opinion as to how much time must pass between a customer placing an order and a route salesperson's termination before the employer no longer has a legitimate protectable interest in that customer. Our holding today under the facts of this case is that the interim of one year is not too long.

 c. Star Direct's Interests in Prohibiting Competition with Customers Dal Pra has not Recently Contacted.

¶ 42. The second argument Dal Pra makes is that the non-compete clause prohibits interference with customers whom Dal Pra may not have been in contact

296

with for years.[8] For example, the customer clause would prohibit him from soliciting a current or past customer whom Dal Pra might have serviced when he began with CB Distributors many years ago, but has had no contact with since. Dal Pra argues that this provision is unreasonable.

¶ 43. Dal Pra maintains that the court of appeals decision in *Milosch* mirrors this situation and is dispositive. In *Milosch,* the employer attempted to prohibit the employee for 18 months following termination from doing business with any customers of the employer with whom the employee had dealt during any portion of his 15–year employment, including customers who may have long ago transferred their business to competitors. *Id.*, ¶ 15 n.4. The court determined that a customer serviced 15 years earlier constituted too long a timeframe for the employer to have any protectable interest. *Id.* ("This restriction is unreasonable because it would prohibit Milosch from doing business with a customer he serviced during his first weeks of employment in 1982 who subsequently transferred his or her business to a competitor of Equable.")

¶ 44. The difference between *Milosch* and this case is that the customers in *Milosch* did not need to be recent or current customers at all; this makes all the difference. The court of appeals in *Milosch* specifically cited the customer whom Milosch could have serviced during the first weeks of his employment 15 years earlier who then took his or her business elsewhere. *Id.*

[8] In fact, the customer clause prohibits interference with current or past customers that Dal Pra might never have had contact with or serviced. Such customers, however, are only on the prohibited customer list if Dal Pra has "special knowledge" about them, as described below.

297

¶ 45. Contrary to Dal Pra's assertions, his special knowledge of customer needs, pricing, and profit margins means that there was real danger in him seeking Star Direct's current and past customers. The fact that he would not necessarily have had recent contact with those customers does not mean Star Direct has no legitimate interest. Even if Dal Pra was not the recent servicer of a customer, he would still have some relationship with that customer, important knowledge about that customer, or maybe most significantly, special knowledge about Star Direct's business and methods.

¶ 46. Dal Pra's employment contract provided unambiguous notice of the confidential "special knowledge" Dal Pra gained through his employment with Star Direct. This confidential information included customer lists, account projections, customer strategy information, marketing information, expense policy manuals, billing reports, pricing information and strategies, management methods and systems, contracts with customers, correspondence with customers, customer bids and proposals, and any other confidential, unique, or secret information.

¶ 47. Furthermore, as we stated in *Hamilton,* it is "beyond dispute" that a former employee's possession of this type of "confidential business information" "may be a proper subject of protection by restrictive covenant," even if the information is related to customers with whom the former employee had not had any contact during his employment. *Hamilton,* 101 Wis. 2d at 469. This reasoning applies equally to customers Dal Pra may have serviced earlier in his employment.

¶ 48. In short, Dal Pra learned information either about the customers and/or about Star Direct's business that would give him a unique advantage against Star Direct if he was allowed to pursue current and recent

298

past customers, even those with whom he had not recently dealt. We conclude this is reasonably necessary for the protection of the employer.

 d. Star Direct's Alleged Inconsistency in Obtaining Restrictive Covenants from its Route Salespeople

¶ 49. Dal Pra argues that the restrictions in the customer clause are unreasonable and unnecessary for Star Direct's protection as evidenced by Star Direct's alleged inconsistency in obtaining restrictive covenants from its route salespeople.

¶ 50. The record is clear that Star Direct substantially adjusted its business practices in 2002 when the new owner took over the company and began requiring all new route salespeople to sign restrictive covenants. The only route salespeople who do not have covenants not to compete are the five individuals who were employed before the current owner bought the company in 2002. As the owner stated, there was the obvious risk that the current employees would not sign them if asked to, or would leave and begin competing with Star Direct. In fact, employers may not compel their existing employees to sign restrictive covenants without additional consideration. *NBZ, Inc.,* 185 Wis. 2d at 837–39. It is also clear that Star Direct assigned great value to the prospect of preventing competition from Dal Pra in particular as evidenced by its offer of a $30,000 bonus upon his completion of 30 months of employment. The fact that Star Direct has been consistent with all new route salespeople since 2002, when it also purchased the routes from CB Distributors, demonstrates sufficient consistency in ob-

299

taining non-compete agreements and shows that Star Direct did consider the risks posed by Dal Pra leaving and competing to be very real.

¶ 51. In short, we are untroubled by the fact that not every salesperson had a non-compete agreement. Star Direct has been consistent since 2002 for all new employees, and offered Dal Pra a $30,000 bonus for his retention, demonstrating the competitive risk that it legitimately fears from post-termination route salespeople like Dal Pra.

### e. Customer Clause Conclusion

¶ 52. We decline to permit Dal Pra to usurp for his own benefit the customers, relationships, and opportunities that Star Direct paid for and invested in. The customer clause is necessary for Star Direct's protection because without it there is nothing preventing Dal Pra from taking advantage of all of Star Direct's investment in its route and customers for his own benefit and to Star Direct's detriment. The customer clause's time restrictions, geographic restrictions, impact on Dal Pra, and impact on public policy are not seriously contested by the parties. We conclude, then, that the customer clause is reasonable and enforceable on its own merits.

### 2. The Business Clause

¶ 53. The business clause bars Dal Pra, for 24 months following his termination, from engaging "in any business which is substantially similar to or in competition with the business of [Star Direct], within a fifty (50) mile radius of Rockford, Illinois." The circuit court and court of appeals both held that the business clause was unenforceable.

¶ 54. The focal point of the dispute regarding the business clause is the "substantially similar" language. Star Direct argues that a "substantially similar" business is one that is, by definition, competitive. It even stated in oral argument that the phrase is possibly the result of an overzealous lawyer and should have been left out. Dal Pra responds that this approach turns the phrase "substantially similar" into pure surplusage.

¶ 55. We agree with Dal Pra and find Star Direct's argument unavailing. The disjunctive "or" plainly separates one from the other. A substantially similar business cannot refer to the same thing as a business "in competition with" Star Direct; nor would it be reasonable to read "substantially similar" as merely a subset of competitive activity as Star Direct urges. The only reasonable way to read the contract language giving meaning to every phrase is that it attempts to bar Dal Pra not only from competitive enterprises, but also from engaging in a business that is substantially similar to Star Direct's business yet not competitive.

¶ 56. An enforceable restrictive covenant must be reasonably necessary for the protection of the employer. *See* Wis. Stat. § 103.465. We do not believe it is reasonably necessary for the protection of Star Direct to prevent non-competitive or otherwise non-deleterious business activity by its former employees.[9] *See Geocaris v. Surgical Consultants, Ltd.*, 100 Wis. 2d 387, 389, 302 N.W.2d 76 (Ct. App. 1981) (concluding that a surgical practice's attempt to prohibit a surgeon from practicing any other type of medicine, including non-competitive

---

[9] It would be somewhat odd to hold that Star Direct has a business interest in prohibiting non-*competitive* activities via an agreement purporting to limit *competition* (i.e. a non-compete).

301

non-surgical medicine, was unreasonable). While having Dal Pra engage in a non-competitive substantially similar business might plausibly have some de minimus or insubstantial affects on Star Direct, the interests do not rise to the level of being reasonably necessary for its protection. A former employee engaged in a similar but non-competitive enterprise poses little if any additional danger to his former employer's business interests than any other member of the public engaged in substantially similar but non-competitive activities. *Lakeside Oil,* 8 Wis. 2d at 163 ("An employer is not entitled to be protected against legitimate and ordinary competition of the type that a stranger could give.").

¶ 57. The parties spend considerable time in their briefs debating what exactly a substantially similar business might or might not include. Star Direct argues for a narrow interpretation that essentially includes competitive business activities. Dal Pra points to the statement in the contract defining the business of Star Direct as "the distribution of consumer products to service stations and/or convenience stores." The precise nature of a substantially similar business—what products Dal Pra could plausibly sell and not sell—is unnecessary to our determination, however. As discussed above, it is clear that a substantially similar business must refer to a non-competitive business, and such a prohibition is not necessary for Star Direct's protection.

¶ 58. In sum, we conclude that the business clause's restriction on engaging in a "substantially similar" business is overbroad and is not reasonably necessary for the protection of Star Direct. Because the clause does not protect a legitimate business interest, we need not measure the business clause against the remaining four *Lakeside Oil* criteria for determining the enforceability of restrictive covenants. The lack of

any protectable interest means the business clause is unreasonable and unenforceable.

3. The Confidentiality Clause

■

¶ 59. The confidentiality clause of the employment contract consists of a single, convoluted paragraph beginning with an 18–line sentence containing 20 sub-clauses separated by 19 commas. Put gently, it is not a model of clarity. The confidentiality clause bars Dal Pra, for 24 months following his termination, from using or disclosing "any information or knowledge, known, disclosed or otherwise obtained by him during his employment by Employer or CB Distributors." It then lists a variety of specific information that is to be deemed confidential and protected, including but not limited to knowledge "conceived, discovered or developed by Employee or CB Distributors," "proprietary products or procedures," trade secrets, customer lists, "marketing techniques which are not generally known in the business community, and which relate to the business of the Employer or CB Distributors or are in the nature of trade or business secrets," mailing lists, and special pricing information.

¶ 60. Though Star Direct did not bring a claim under the confidentiality clause, the circuit court concluded that it was overbroad and unenforceable because it barred Dal Pra from using or disclosing *any* information.[10] The court of appeals did not address this issue.

---

[10] At the summary judgment hearing, the circuit court concluded that the confidentiality clause bars Dal Pra from disclosing or using "any information obtained during his employment," explaining:

¶ 61. Dal Pra does not assert that the provision is unreasonable as to its duration, geographic scope, to himself, or to public policy. Neither do we find anything in the record that calls these into question. Thus, the main question is whether the prohibitions of the confidentiality clause are reasonably necessary for the protection of Star Direct. And the central dispute is what the clause actually means.

■■■■

¶ 62. One of the running themes in this case is how broadly or narrowly to read restrictive covenants. As discussed earlier, it is true that we read restrictive covenants in favor of the employee. *Streiff,* 118 Wis. 2d at 611. But this does not mean we make an effort to read a clause unreasonably in order to find the clause unreasonable and unenforceable against the employee. Though they are disfavored at law, our task is still to rightly and fairly interpret non-compete agreements as contracts. *See Wysocki,* 243 Wis. 2d 305, ¶ 11. ("[W]e cannot allow the underlying policy of Wis. Stat. § 103.465 and our rules of construction to overwhelm the focus of our analysis in what are, at their core, contract cases.") This means we must interpret them reasonably so as to avoid absurd results, giving the words their plain meaning, reading as a whole, and giving effect where possible to every provision. *In re All-Star Ins. Corp.,* 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983); *DeWitt Ross & Stevens, S.C. v.*

---

[The confidentiality clause] prevents him from saying, I have a good idea. I am going to go back to these customers. Their hot dogs are crummy. I want them to start selling them [sic] something that I like to eat. Well, he can't do that because he is using information or knowledge that only he learned from having eaten the hot dogs at these places. If he has a better idea, he can't use it because the restrictive covenant is so broad.

*Galaxy Gaming & Racing Ltd. P'ship,* 2004 WI 92, ¶ 44, 273 Wis. 2d 577, 682 N.W.2d 839. It is only within this framework that we interpret restrictive covenants in favor of the employee.

¶ 63. Here, the language of the confidentiality clause betrays the circuit court's interpretation. All of the enumerated examples of protected information in the confidentiality clause are of a proprietary nature. This is important for at least two reasons. First, the inclusion of examples, particularly with modifiers indicating the confidential nature of the information, shows that the circuit court's interpretation is in error. For example, the modifier "proprietary" when discussing products and procedures would be rendered mere surplusage if the clause truly means "any information." Similarly, the clause prohibits the divulging of marketing techniques "not generally known in the business community." Again, this language would be surplusage under the circuit court's approach. Additionally, we think the confidential nature of the itemized examples indicates the true intent of the clause. The only reasonable construction of the clause considered in its totality is that it prohibits Dal Pra's use of confidential information of the type identified in the examples— information of a confidential and sensitive nature that, if made public or used by Dal Pra, would be deleterious to Star Direct's business. All of the itemized examples fit this general pattern.

¶ 64. Prohibiting Dal Pra from exploiting or disclosing this information is reasonably necessary for Star Direct's protection. As already noted, the parties do not seriously dispute that the confidentiality clause is reasonable as to time, territory, to Dal Pra, and to the public or public policy. Therefore, we conclude that the

confidentiality clause is enforceable so long as it is divisible from the unenforceable business clause. That is where we now turn.

B. The Divisibility of the Restrictive Covenants

1. The Divisibility of Restrictive Covenants Generally

¶ 65. Wisconsin Stat. § 103.465 provides that if "[a]ny covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint." This statute was passed in 1957 in response to our decisions in *Fullerton Lumber Co. v. Torberg*, 270 Wis. 133, 70 N.W.2d 585 (1955), and its companion case *Fullerton Lumber Co. v. Torberg*, 274 Wis. 478, 80 N.W.2d 461 (1957), authorizing courts to modify unreasonable covenants to make them reasonable and enforceable. *See Streiff*, 118 Wis. 2d at 607–09 (discussing common law blue-penciling, which the court then departed with in the *Torberg* cases, prompting the legislature to pass Wis. Stat. § 103.465).

¶ 66. In *Streiff*, we addressed the divisibility of clauses under this statute. The restrictive covenant there provided that a terminated insurance agent employee could receive payment for extended earnings only if he refrained from certain competitive practices. *Id.* at 603, 606–07. After termination, the employer refused to pay extended earnings to the former agent, alleging that he had violated two of the restrictive provisions—one prohibiting the sale of insurance for any other insurer in any state in which the employer was a licensed insurer, and the other prohibiting the solicitation of the employer's insureds. The employer

eventually conceded that the first provision was unreasonably broad in its territorial scope and therefore unenforceable. *Id.* at 605, 607. The employer urged, however, that the provision prohibiting customer solicitation was divisible from the overbroad provision, and thus the covenant as a whole should not be declared unenforceable under Wis. Stat. § 103.465. *Id.* at 609. We then undertook to determine whether the contract's provisions were divisible into separate covenants.

¶ 67. The provisions of the restrictive covenant in *Streiff* were textually linked via a cross-referential third provision such that it was impossible to read, evaluate, or apply one without referring to the others. For instance, one provision stated that former employees would be paid extended earnings only if they complied with all other provisions in the contract. *Id.* at 606. A second provision was overbroad in providing for a forfeiture of extended earnings if a former employee engaged in certain insurance related activities in any state in which the employer was licensed. *Id.* at 606–07. A third provision prohibited certain activities related to the solicitation and servicing of the former employer's insureds, but did not expressly refer to the first provision's forfeiture of extended earnings upon non-compliance. *Id.* at 605–06.

¶ 68. Thus, to know what activities were prohibited under the first provision in *Streiff,* an employee would need to refer to all of the provisions of the contract, including the second provision (which restated the penalty for non-compliance), and the third provision (which did not). However, to understand the ramifications of not complying with the third provision, an employee would need to refer back to the first provision which mandated compliance with the contract in its entirety. The second and third provisions in

*Streiff,* then, were textually linked by the first provision and were thereby indivisibly intertwined.

¶ 69. We therefore concluded that the provisions in *Streiff,* which cross-referenced each other and made entitlement to extended earnings under one provision dependent upon compliance with other provisions, were "intertwined and the covenant must be viewed in its entirety, not as divisible parts." *Id.* at 613.

¶ 70. In *Brass,* the court of appeals purported to apply *Streiff* to restrictive covenants in a factual scenario also involving a former insurance agent employee. The court of appeals construed *Streiff* as providing that provisions are intertwined and indivisible when "they govern several similar types of activities and establish several time and geographical restraints." *Brass,* 242 Wis. 2d 733, ¶ 11.

¶ 71. The court of appeals in the present case applied *Brass*'s construction of *Streiff* to find that the customer clause governed activity similar to and therefore indivisible from the unenforceable business clause. *Star Direct, Inc.,* No. 2007AP617, unpublished slip op., ¶ 26. Judge Vergeront, the author of the majority opinion, observed in a concurrence, however, that "*Streiff* does not support the conclusion that the customer clause and the business clause are indivisible and, therefore, one covenant." *Id.,* ¶ 30. She maintained that the conclusion in *Streiff* was based on the textual link between the various clauses in that case. *Id.,* ¶ 31. She stated that she "would not read *Streiff* as establishing a test for indivisibility under which clauses are indivisible if they 'govern several similar types of activities and establish several time and geographic restraints.' " *Id.* (citing *Streiff,* 118 Wis. 2d at 613). She expressed further concern that *Brass* provides a framework in which practically all restrictive covenants in an

308

employment agreement are indivisible, and that *Streiff* does not require such a result. *Id.*, ¶ 33.

¶ 72. We agree with Judge Vergeront's observations. We read *Streiff* as being premised primarily on the fact that the provisions were intertwined via their textual link. Nowhere does *Streiff* purport to establish a comprehensive test or set of factors to be analyzed for determining whether restrictive covenants are indivisible.

¶ 73. In fact, the court went out of its way to reserve much of the debate for future cases. In its discussion of the history of the adoption of Wis. Stat. § 103.465, it notes that Wisconsin used to follow the blue-pencil rule, in which it was empowered to strike the overly broad language of a restraint and enforce the divisible valid restraints. *Streiff,* 118 Wis. 2d at 607–08. Under the blue-pencil rule, however, "where the contract furnished no basis for dividing the restriction into reasonable and unreasonable portions, the whole covenant was void if any part of the restriction was unreasonable." *Id.* at 608. As the court in *Streiff* explained, we departed from this in the *Torberg* cases by enforcing an invalid, indivisible covenant after changing a 10–year prohibition to a three-year prohibition. *Id.*

¶ 74. The court in *Streiff* explicitly stated that it was not deciding "whether a restraint which is reasonable as to activity, duration, and territory is enforceable under sec. 103.465, when the agreement includes a second restraint which is unreasonable as to activity, duration, and territory and is unenforceable under sec. 103.465." *Id.* at 613. In other words, the court was not purporting to decide whether Wis. Stat. § 103.465 overruled the common law distinction between divisible and indivisible contracts, or just blue-penciling of divisible contracts as was done in *Torberg. See id.* at 609 n. 4.

¶ 75. The court in *Streiff,* then, determined that the clauses in that case were indivisible, but it did not announce any new or comprehensive test for determining when a clause is divisible or not divisible under Wis. Stat. § 103.465.

¶ 76. Though the question was withheld in *Streiff,* we now make clear that we believe the legislative history and text of the statute do not eliminate or modify the common law rules on divisibility. The statute's prescriptions support this as they apply to any "covenant," not to the whole employment contract. It specifies that if a restraint is unreasonable, the rest of that covenant is also unenforceable. *See* Wis. Stat. § 103.465.

¶ 77. In practice, most restrictive covenant provisions cover similar types of activity, or at least have substantial overlap. Often they will be drafted to accord with the employer's particular protectable interests. Thus, the expansive reading of *Streiff* offered in *Brass* does in fact render nearly all covenants not to compete unenforceable if one provision of one of the covenants is unreasonable. We do not believe Wis. Stat. § 103.465 or *Streiff* compel this result.

¶ 78. The foundational inquiry for determining whether a covenant is divisible is whether, if the unreasonable portion is stricken, the other provision or provisions may be understood and independently enforced. This inquiry will be fact-intensive and depend on the totality of the circumstances. In the context of multiple non-compete provisions in a contract, indivisibility will usually be seen by an intertwining, or inextricable link, between the various provisions via a textual reference such that one provision cannot be read or interpreted without reference to the other.

310

Restrictive covenants are divisible when the contract contains different covenants supporting different interests that can be independently read and enforced.[11] Overlap, even substantial overlap, between clauses is not necessarily determinative. Employers may have several protectable interests that apply in similar, though not exactly the same, situations and it makes sense to set these out in separate post-termination restrictive covenants.[12]

2. The Divisibility of the Restrictive Covenants here.

¶ 79. In the case at bar, the business clause, customer clause, and confidentiality clause do not ref-

---

[11] This approach accords with the common law (blue-penciling aside), which also queried whether, if the unreasonable portion was excluded, the provisions could be independently read and understood. *See Fullerton Lumber Co. v. Torberg,* 270 Wis. 133, 151, 70 N.W.2d 585 (1955) (Gehl, J., dissenting) (noting that "the fact of divisibility must appear from the contract itself"); *Wis. Ice & Coal Co. v. Lueth,* 213 Wis. 42, 47, 250 N.W. 819 (1933) (holding that an unreasonable territory limitation was indivisible from the rest of the restrictive covenant because "the contract itself furnishe[d] no basis" for division); *Gen. Bronze Corp. v. Schmeling,* 208 Wis. 565, 572, 243 N.W. 469 (1932) (holding that a covenant was divisible when the unreasonable restrictions on geography could be dropped and the contract still enforced on its own terms).

[12] We reject the *Brass* court's construction of *Streiff.* We do not construe Streiff as announcing a rule that provisions are "intertwined and indivisible because they govern several similar types of activities and establish several time and geographical restraints." *Mutual Serv. Cas. Ins. Co. v. Brass,* 2001 WI App 92, ¶ 11, 242 Wis. 2d 733, 625 N.W.2d 648. We therefore overrule *Brass*'s holding in this regard.

311

erence each other. Neither is compliance with or the benefits of one dependent upon compliance with or the benefits of the other. Each deals with different interests. The business clause prohibits Dal Pra from engaging in competitive or substantially similar business activities in Dal Pra's former sales territory. This clause (though unreasonable and unenforceable as discussed above), protects a geographic territory. The customer clause is focused on protecting Star Direct's relationships with its current and recent past customers, which could be undermined by the efforts of a former route salesperson if left unchecked. The confidentiality clause prohibits the use or disclosure of confidential information.

¶ 80. There is certainly substantial overlap between these provisions. The customer clause, for example, prohibits engagement with certain current and recent past customers who, as a practical matter, will mostly be those in Star Direct's former sales territory, the area covered by the business clause. And the confidentiality clause prohibits the use of information that will basically prevent Dal Pra from engaging Star Direct customers with whom he dealt, which will be those in his former sales territory.

¶ 81. But the interests the clauses protect are (with the exception of the overbroad provisions of the business clause) legitimate and separate interests. The provisions are also not textually linked, intertwined, or mutually entangled in any way. In other words, one need not refer to the business clause or confidentiality clause, for example, to determine one's rights under the customer clause. The business clause, customer clause, and confidentiality clause may each be read, evaluated, and applied independently. Striking the overbroad busi-

ness clause does not affect the independently sufficient and enunciated provisions of the customer and confidentiality clauses.

¶ 82. For these reasons, the three clauses at issue here are separate, independent, and divisible covenants. As such, the customer clause and confidentiality clause, which we have found to be reasonable, are independently enforceable despite the overbroad and unenforceable business clause.

## IV. CONCLUSION

¶ 83. We conclude that the customer and confidentiality clauses are reasonably necessary to protect Star Direct and therefore enforceable. The business clause, however, is overbroad and unenforceable. We also hold that the customer and confidentiality clauses are divisible from the business clause and enforceable on their own terms. We thus affirm in part and reverse in part the decision of the court of appeals, and remand this cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision by the court of appeals is affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 84. ANN WALSH BRADLEY, J. (*concurring in part and dissenting in part*). The majority aptly explains that restrictive employment covenants are prima facie suspect and are permitted only to the extent absolutely necessary to protect an employer's legitimate interests. Thus, the employer bears the burden of demonstrating that a covenant is reasonable and necessary for its protection. Following these principles, I

agree with the majority that Star Direct failed to meet its burden. The business clause is overly broad and therefore unenforceable.

¶ 85. I write separately, however, for two reasons: (1) contrary to the majority, I conclude that Star Direct has not met its burden to demonstrate that the customer clause is reasonably necessary to protect its legitimate interests in past customers, including past customers that Dal Pra never developed a relationship with or serviced; and (2) I find that the new interpretive tool created today by the majority—that silence on an issue signals approval—is contrary to precedent, principles of judicial restraint, and makes no sense.

I

¶ 86. The circuit court focused on the restriction regarding past customers when it determined that the customer clause was unenforceable. In rendering a determination, it stated that "clearly" the customer clause was "overbroad to me, without any question, as far as it prohibits Dal Pra from contacting people who had been customers of [Star Direct] within the time period of one year prior to the termination of his employment." The court clarified that the covenant "involves not just ongoing customers—I can see the need to protect your current customers, but these are customers who have already said, we don't want to deal with you anymore."

¶ 87. Contrary to the circuit court, the majority concludes that Star Direct not only has an interest in its current customers, but that its protectable interest also extends to those past customers who were customers within one year of Dal Pra's termination. Majority op., ¶ 38. It explains that Dal Pra would have knowledge

314

about the customer's needs and product desires or Star Direct's business model, and that he "would have a relationship history with many of them." Majority op., ¶ 39, *see also id.,* ¶¶ 31, 42 n.8. The majority concludes that "Star Direct does have an interest in prohibiting the solicitation" of these past customers because it has "a general interest in winning back the business of its recent past customers." Majority op., ¶¶ 38, 40.

¶ 88. Acknowledging that no Wisconsin case has addressed an employer's interest in recent past customers, the majority cites as support several cases that did not address the question and indicates that silence on the issue signals approval. It concludes that Wisconsin courts have been "untroubled" by an employer's asserted interest in past customers. *See* majority op., ¶¶ 31–37.

## II

¶ 89. In addition to preventing Dal Pra from soliciting Star Direct's current customers, the customer clause unequivocally restricts Dal Pra from contacting past customers of Star Direct. The clause extends to "any person, firm, corporation, partnership, or entity . . . which is a customer of [Star Direct] or which was a customer . . . within a period of time of one year prior to [Dal Pra's] termination." Dal Pra may not "approach any such customer or past customer" for the purpose of interfering with or endeavoring to entice away that customer.

¶ 90. The customer clause encompasses customers "for which [Dal Pra] performed services or otherwise dealt with on behalf of [Star Direct] or relative to which [Dal Pra] obtained special knowledge as a result of his position with [Star Direct.]" The majority defines

special knowledge as knowledge regarding the needs and wants of the customers and Star Direct's pricing, costs, and profit margins. Majority op., ¶ 31. Because Dal Pra is knowledgeable about Star Direct's pricing, costs, and profit margins, I conclude that he has "special knowledge" about all of Star Direct's past customers. Therefore, all past customers within one year of Dal Pra's termination are within the restrictive covenant, including customers with whom Dal Pra never developed a relationship on behalf of Star Direct.

¶ 91. "Where a restraint of trade is tolerated, it is permitted only to the extent absolutely necessary to afford reasonable protection." *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 218, 267 N.W.2d 242 (1978). The employer bears the burden of demonstrating that the covenant is reasonable. *NBZ, Inc. v. Pilarski,* 185 Wis. 2d 827, 840, 520 N.W.2d 93 (Ct. App. 1994). Because restraints of trade are presumptively invalid, the employer must place facts in the record that could demonstrate that it has a protectable interest in the customers covered by the covenant. It is therefore incumbent upon Star Direct to justify the restraint prohibiting Star Direct from contacting past customers.

¶ 92. On review, the court looks to the evidence submitted by the parties. The president of Star Direct, Bradley Son, submitted three affidavits to demonstrate the reasonableness of the restraints.

¶ 93. In his first affidavit, Son explained: "The covenant not to compete is necessary to protect Star Distributing because, given the frequency with which Dal Pra came into contact with Star Distributing's customers and potential customers in the territory for which he was responsible, . . . upon termination of Dal Pra's employment with Star Distributing, Dal Pra might be capable of taking or otherwise appropriating

Star Distributing's business and relationships." He further stated: "The purpose of the [customer clause], of course, is to prevent Dal Pra from unfairly competing with Star Distributing by taking advantage of the relationship, rapport, and knowledge he developed by serving particular customers of Star Distributing."

¶ 94. These statements address those current and potential customers with whom Dal Pra developed a relationship and served on behalf of Star Direct, and they justify Star Direct's protectable interest in those customers. However, absent from this discussion is any justification of Star Direct's protectable interest in customers whom he did not serve, especially those past customers who have taken their business elsewhere.

¶ 95. In his supplemental affidavit, Son explained that Dal Pra's knowledge of Star Direct's pricing and profit margins would allow Dal Pra to unfairly compete: "Dal Pra has special knowledge about the prices at which Star Distributing sold various products to certain customers, including the customers he called on." Further, "If a competitor knew the prices that Star Distributing paid for its products, especially a competitor who was trying to 'get its foot in the door' with a customer, the competitor could quote a price to the customer which was very close to or even below Star Distributing's costs." "[T]he competitor would have a 'road map' as to how to price its various products to compete with Star Distributing."

¶ 96. Again, the supplemental affidavit explains why Star Direct has a protectable interest in preventing Del Pra from soliciting its current customers. Yet, there is no reference to Star Direct's past customers and no justification for prohibiting Dal Pra from contacting those customers who no longer purchase products from Star Direct.

¶ 97. In his second supplemental affidavit, Son asserted that restricting Dal Pra from enticing away current customers was necessary to protect Star Direct's legitimate business purposes:

> Precluding Mr. Dal Pra from attempting to entice away *current customers of Star Distributing* with whom he previously dealt with on behalf of Star Distributing . . . or about whom he acquired special knowledge is not unreasonable *even if Mr. Dal Pra did not have recent contract with the customer.*

(Emphasis added.) This statement expressly addresses Star Direct's protectable interest in current customers. There is no mention whatsoever of past customers.

¶ 98. Taken together, Son's affidavits provide facts that justify Star Direct's legitimate protectable interest in prohibiting Dal Pra from attempting to entice away Star Direct's current customers. Absent from these affidavits, however, is any fact or rationale for restricting Dal Pra's contact with past customers. Dal Pra cannot "take or otherwise appropriate" a business relationship if it no longer exists, and he cannot "interfere with, or endeavor to entice away" a customer that has already stopped purchasing from Star Direct on its own accord.

¶ 99. Star Direct argues, and the majority agrees, that Dal Pra would be in a unique position to recruit customers who had recently stopped purchasing from Star Direct. *See* majority op., ¶ 38. The majority contends that Dal Pra "would have all the information a competitor would want and need to know how to effectively undercut Star Direct." *Id.* Even so, this does not mean that Star Direct retains a protectable interest in these customers, justifying the restraint. Although the majority asserts that Star Direct has a "general"

318

interest in winning back recent past customers, Star Direct has failed to place into the record any evidence justifying this conclusion.

¶ 100. Furthermore, the court of appeals has previously concluded that a covenant prohibiting contact with former customers was unenforceable. In *Equity Enterprises, Inc. v. Milosch,* 2001 WI App 186, 247 Wis. 2d 172, 633 N.W.2d 662, the court considered a non-compete agreement that prevented an employee from "interfer[ing] in any way with the relationship between the Customers and [the employer, Equable]." *Id.,* ¶ 2. The agreement defined "Customer" as "any customer of Equable or any Related Party with whom Employee transacted business or whom Employee serviced on behalf of Equable during any part of Employee's employment." *Id.*

¶ 101. The court called the restriction "unreasonable" because it prohibited contact with former customers:

> This restriction is unreasonable because it would prohibit Milosch from doing business with a customer he serviced during his first weeks of employment in 1982 who subsequently transferred his or her business to a competitor of Equable. Such an overbroad restriction is invalid because *preventing Milosch from contacting former Equable customers is not reasonably necessary to protect Equable's legitimate business interests.*

*Id.,* ¶ 15 n.4 (emphasis added).

¶ 102. The *Equity Enterprises* court did not establish a per se rule against covenants restricting contact with former customers. Nonetheless, the court again reaffirmed the principle that such covenants are suspect, and that the employer must have a legitimate protectable interest justifying the restriction imposed on the activity of the employee.

¶ 103. The majority distinguishes *Equity Enterprises* by pointing out that the covenant in that case looked back 15 years, whereas the covenant at issue here looks back only one year. Majority op., ¶ 46. Yet, the holding in *Equity Enterprises* was not limited to a specific number of years. The employer has to burden to demonstrate that any restrictive provision is justified, and here, neither Star Direct nor the majority has demonstrated that it has a protectable interest in past customers at all.

¶ 104. At a minimum, the court should remand for factfinding on the issue of past customers. Based on the record provided by the parties, however, I conclude that no such protectable interest in past customers exists justifying the restraint.[1]

### III

¶ 105. In addition to the majority's conclusion, I disagree with the new interpretive tool of appellate analysis created today by the majority. To conclude that silence on an issue somehow suggests approval is not supported by precedent, principles of judicial restraint, or common sense.

¶ 106. The majority cites as supportive a number of cases that did not address the question of past customers. It asserts that "Wisconsin courts, including this court, have reviewed provisions that clearly apply to past customers, and have been untroubled by this asserted interest." Majority op., ¶ 32. Although the majority acknowledges that the silence is not dispositive, it nevertheless cites to the silence as persuasive.

---

[1] Because I conclude that the business clause and the customer clause are both unenforceable, I need not determine whether the covenants are divisible.

(See ¶¶ 32–37, discussion of the silence in *Rollins Burdick Hunter of Wis., Inc. v. Hamilton,* 101 Wis. 2d 460, 304 N.W.2d 752 (1981) and *Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki,* 2001 WI 51, 243 Wis. 2d 305, 627 N.W.2d 444.)

¶ 107. The problem with the majority's approach is that it assumes that silence on an issue signals the court's approval. This assumption does not square with our case law. I need go no further than to cite an opinion that is being released today, *Horst v. Deere & Co.,* 2009 WI 75, 319 Wis. 2d 147, 769 N.W.2d 536.

¶ 108. One of the issues in *Horst* was the correctness of the standard special verdict question in a strict products liability case involving an injured bystander.[2] The standard verdict question asks: ". . . was the product in a defective condition so as to be unreasonably dangerous to a prospective user/consumer?" Wis JI—Civil 3260. Given that the injured party was a bystander rather than a user or consumer, the plaintiffs requested that the special verdict be modified to ask whether the product was "in a defective condition so as to be unreasonably dangerous to a prospective user/consumer or bystander." *Horst,* 319 Wis. 2d 147,

---

[2] The petitioners in *Horst* set forth two issues for review in their brief. The first issue is stated as follows:

ISSUES PRESENTED FOR REVIEW

1. Did the trial court err when, over objection, it worded the § 402A special verdict question to ask the jury whether the Deere & Company mower "was in a defective condition so as to be unreasonably dangerous to a prospective user/consumer," rejecting plaintiff-appellants proposed special verdict question asking whether the mower was in a defective condition so as to be unreasonably dangerous to bystanders?

Brief of Plaintiff-Appellant-Petitioners at vi, *Horst v. Deere & Co.,* 2009 WI 75, 319 Wis. 2d 147, 769 N.W.2d 536.

¶ 13. The plaintiffs pointed to a previous case, *Howes II*,[3] in which a nearly identical proposed special verdict question was used.

¶ 109. We affirmatively rejected their suggestion that our silence regarding the special verdict question signaled approval. Instead, we stated the general rule that opinions of the court do not "purport to address a proposition greater than the legal question before the court." *Horst,* 319 Wis. 2d 147, ¶ 45. We stated:

> In *Howes II,* the special verdict question was admittedly almost identical to the Horsts' proposed special verdict question. But *the special verdict question was not affirmed or intentionally addressed by the court.*

*Id.,* ¶ 49 (emphasis added).

¶ 110. The assumption that silence signals support also does not square with fundamental principles of judicial restraint. A court generally relies on the parties to frame the issues on review. When the parties do not raise an issue, we do not decide it. Accordingly, the stated propositions in a court's opinion were considered and decided by the court and therefore have precedential value. Propositions that are unstated, and perhaps unconsidered, do not.

¶ 111. To interpret the court's silence on an issue that could have been implicated in a dispute as a tacit decision on it merits unsettles these principles. Such a framework would force the court to reach out and decide issues not presented by the parties and without full briefing and arguments on the merits.

---

[3] *See Howes v. Deere & Co. (Howes II)*, 71 Wis. 2d 268, 271, 238 N.W.2d 76 (1976) (mentioning that the following special verdict question was given: "Was the John Deere mower in question . . . defective in design so as to be unreasonably dangerous to a bystander?").

¶ 112. Finally, to assume that silence signals support is contrary to common sense. Every case involves a complicated set of facts and potential legal issues. When rendering a decision on the issue presented, the court must describe the facts of the case in order to give context to the legal principles it sets forth. Potential issues may lurk, undiscovered, among the facts of the case.

¶ 113. For the reasons discussed above, I respectfully concur in part and dissent in part.

¶ 114. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence/dissent.

¶ 115. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I join Justice Bradley's opinion. I write separately to explain the rationale underlying Wis. Stat. § 103.465. It is important to understand the legislature's reasoning and policy determinations in deciding restrictive covenant cases.

¶ 116. Wisconsin Stat. § 103.465 has placed the onus on employers to draft reasonable restrictive employment covenants. As a result of § 103.465, Wisconsin courts give effect to reasonable covenants but do not rewrite unreasonable covenants to save them.

¶ 117. Courts and commentators have debated the equities of courts' rewriting unreasonable covenants to give effect to their reasonable aspects.[1] The

---

[1] Our court has summarized the debate as follows:

An argument for giving effect to reasonable aspects of a restraint is the business need for restrictive covenants and the difficulty for larger businesses to tailor each covenant to the particular requirements of the individual employee. A principal argument against giving effect to reasonable aspects of a restraint is that the employer can fashion ominous covenants which affect the mobility

Wisconsin legislature has opted to require employers to draft reasonable restrictive covenants, not the courts.

¶ 118. The legislature has adopted a balanced approach that accounts for the interests of employers, of employees, and of the public as well. The legislature has determined the equities between employers, employees, and the public in Wis. Stat. § 103.465.

¶ 119. Restrictive employment covenants serve an important business purpose.[2]

¶ 120. At the same time, an employee has a liberty interest at stake in a restrictive covenant, a "fundamental right . . . to make choices about his or her own employment."[3] Free movement and personal liberty of

of employees because of their *in terrorem* effect on employees who respect contractual obligations and their effect on competitors who do not wish to risk legal difficulties. . . . The legislature has in sec. 103.465 instructed the court as to the equities between the parties. Under sec. 103.465 if an indivisible covenant imposes an unreasonable restraint, the covenant is illegal, void, and unenforceable even as to so much of the covenant as would be a reasonable restraint.

*Streiff v. Am. Family Mut. Ins. Co.,* 118 Wis. 2d 602, 614, 348 N.W.2d 505 (1984).

[2] "From the point of view of the employer, postemployment restraints are regarded as perhaps the only effective method of preventing unscrupulous competitors or employees from appropriating valuable trade information and customer relationships for their own benefit. Without the protection afforded by such covenants, it is argued, businessmen could not afford to stimulate research and improvement of business methods to a desirably high level, nor could they achieve the degree of freedom of communication within a company that is necessary for efficient operation." Harlan M. Blake, *Employee Agreements Not to Compete,* 73 Harv. L. Rev. 625, 627 (1960).

[3] *Heyde Cos. v. Dove Healthcare,* 2002 WI 131, ¶¶ 22–23, 258 Wis. 2d 28, 654 N.W.2d 830 (concluding that a no-hire provision was in violation of Wis. Stat. § 103.465 and stating

employees are pre-eminent features of employment relations in this state.[4] An employer's capacity to draft restrictive covenants constrains the mobility of labor through *in terrorem* effects on employees and competing employers alike.[5] Employees will fear violating even an unreasonable covenant, and businesses that wish to hire employees covered by a restrictive covenant will refrain from doing so to avoid the risk of legal difficulties created by the restrictive covenant.

¶ 121. The third group with an interest in restrictive employment covenants is the public. A restrictive covenant is a restraint of trade.[6] The public has an interest in allowing the free movement of labor, encouraging competition rather than diminishing competition by menacing potential competitors, and encouraging the dissemination of ideas, processes, and methods.[7]

---

that "the fundamental right of a person to make choices about his or her own employment is well-established").

[4] *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 214, 267 N.W.2d 242 (1978) (quoted with approval in *Farm Credit Servs. v. Wysocki,* 243 Wis. 2d 305, ¶ 9).

[5] *Streiff,* 118 Wis. 2d at 614 ("[T]he employer can fashion ominous covenants which affect the mobility of employees because of their *in terrorem* effect on employees who respect contractual obligations and their effect on competitors who do not wish to risk legal difficulties.").

[6] *Heyde Cos.,* 258 Wis. 2d 28, ¶ 13.

[7] "[P]ostemployment restraints reduce both the economic mobility of employees and their personal freedom to follow their own interests. These restraints also diminish competition by intimidating potential competitors and by slowing down the dissemination of ideas, processes, and methods. They unfairly weaken the individual employee's bargaining position vis-à-vis his employer and, from the social point of view, clog the market's channeling of manpower to employments in which its productivity is greatest." Blake, *supra* note 2, at 627.

¶ 122. Recognizing these conflicting interests, the legislature attempted to "balance[] the employer's business needs and the employee's interest in personal liberty" when enacting Wis. Stat. § 103.465.[8] The legislature accommodated the interests of employers by permitting the use of restrictive covenants that are "reasonably necessary for the protection of the employer." Wis. Stat. § 103.465. The legislature protected the interests of employees, however, by mandating that "[a]ny covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint." Wis. Stat. § 103.465.[9]

¶ 123. The history underlying Wis. Stat. § 103.465 reflects the legislature's judgment that a laissez-faire approach to restrictive covenants would unduly privilege the interests of employers over the competing interest of employees. The legislature adopted Wis. Stat. § 103.465 at the suggestion of a legislator who argued that if the courts do not strike down restrictive covenants "containing overly broad and invalid provisions . . . in [their] entirety," employers will be able to use their superior bargaining power "to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full."[10] Section 103.465 thus "was enacted to effect a policy of protecting weaker parties in

---

[8] *Streiff,* 118 Wis. 2d at 614.

[9] *See also Heyde Cos.,* 258 Wis. 2d 28, ¶ 13 ("[T]he explicit purpose of § 103.465, as plainly stated in the statute, is to invalidate covenants that impose unreasonable restraints on employees.").

[10] *Streiff,* 118 Wis. 2d at 608–09.

The drafting record for Wis. Stat. § 103.465 contains a letter from Representative Richard E. Peterson of Waupaca

the bargaining process," a recognized and important goal of public policy in the State of Wisconsin.[11]

¶ 124. In interpreting and applying Wis. Stat. § 103.465, the courts consider the interests of both employers and employees, as well as the interests of the public. The case law states that a restrictive covenant is enforceable if it "(1) [is] necessary to protect the employer; (2) provide[s] a reasonable time limit; (3) provide[s] a reasonable territorial limit; (4) [is not] harsh or oppressive to the employee; and (5) [is not] contrary to public policy."[12] In keeping with the statute, courts

County to the chief of the legislative reference library providing drafting instructions for the statute. Representative Peterson requested a bill drafted to reverse *Fullerton Lumber Co. v. Torborg,* 270 Wis. 133, 70 N.W.2d 585 (1955), in which this court enforced the reasonable aspects of an otherwise unreasonable restrictive covenant. Representative Peterson stated that "[a]t the time [an employment contract is] entered into, the bargaining position of the two contractors appears to me to be relatively unequal in that the party seeking the employment must, if he desires employment with the contracting party, consent to almost any restrictive covenant imposed." He concluded that the effect of the *Fullerton* decision was "to give to the employer complete latitude" in defining the scope of restrictive covenant, safe in the knowledge that the courts would enforce the covenant to any extent that it was reasonable.

[11] *See Gen. Med. Corp. v. Kobs,* 179 Wis. 2d 422, 432 n.7, 507 N.W.2d 381 (Ct. App. 1993) ("[S]ec. 103.465, Stats., was enacted to effect a policy of protecting weaker parties in the bargaining process: 'laws prohibiting covenants not to compete, or that are designed to protect a weaker party against the unfair exercise of superior bargaining power by another party, are likely to embody an important state public policy." (quoting *Bush v. Nat'l School Studios, Inc.,* 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987)).

[12] *Heyde Cos.,* 258 Wis. 2d 28, ¶ 16 (citing *Lakeside Oil Co. v. Slutsky,* 8 Wis. 2d 157, 162–63, 98 N.W.2d 415 (1959)).

apply the following canons of construction to restrictive covenants: "(1) they are prima facie suspect; (2) they must withstand close scrutiny to pass legal muster as being reasonable; (3) they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires; and (4) they are to be construed in favor of the employee."[13]

¶ 125. The legislature and the courts thus avoid a one-sided, "pro-employer" or "pro-employee" analysis of restrictive covenants. Reasonable covenants are enforced; unreasonable covenants are not enforced and are not rewritten by the courts to be reasonable.

¶ 126. I write separately to explain the rationale underlying Wis. Stat. § 103.465. The legislatively adopted policy should guide courts in deciding restrictive covenant cases.

---

[13] *Heyde Cos.*, 258 Wis. 2d 28, ¶ 16 (citation omitted).